

September 15, 2016

**VIA E-FILE**
The Honorable Richard G. Andrews
USDC for the District of Delaware
844 North King Street, Unit 9, Room 6325
Wilmington, DE 19801

FILED UNDER SEAL

Re: *TQ Delta v. Comcast et al., nos. 15-cv-611, 15-cv-612, 15-cv-615, and 15-cv-616*

Dear Judge Andrews:

Plaintiff TQ Delta moves the Court for an order compelling discovery. Defendants have ignored the Court's deadline of July 15 for substantial completion of discovery and refused to comply with a number of document requests (see below). Furthermore, Defendants' objections provide no clarity on what will be searched for and/or produced.[1] Equally troubling is Defendants' contention that only "relevant" documents will be produced that Defendants unilaterally determine are "proportional to the needs of the case." Finally, Defendants have made promises to produce the requested information, only to later renege on their promises. For these reasons, TQ Delta respectfully requests this Court for an order compelling Defendants to produce documents relating to the topics set forth below.

***Computer Generated Financial Reports for the Accused Products.*** Various document requests call for basic financial information tied to the accused products (e.g., units, leasing and other accused product revenues, costs, and margins). To date, Defendants have produced a smattering of miscellaneous documents containing tangentially-related information that is not tailored to the accused products. Some Defendants had previously promised to provide a date certain by which production of this highly relevant damages-related information will be complete. However, these Defendants failed to deliver as promised. Other Defendants promised to complete production of financial information by a date certain, but reneged on the promise. *See, e.g.*, Ex. A, at p. 7 (email chain) (███████████████████████████████████ ██████████████████████████████████████████████████████). Now Defendants' Counsel represents that they "will continue to produce [financial information] on a rolling basis as [they] receive it." *Id.*, at p. 1. In essence, Defendants are seeking a license from this Court to engage in dilatory tactics two months after the deadline for substantial completion of discovery. This is not reasonable. From publicly available information, it is clear the Defendants have this information readily available. *See, e.g.*, Ex. H (TWC Letter to US Senators), at p. 2. TQ Delta requests that the Court order Defendants to complete production of the financial information set forth in the attached order by October 3, 2016.

***Organizational Chart & Equivalent Information.*** Defendants have agreed to produce (but have not yet *actually* produced) organization charts for marketing and sales departments, dating back to 2009. Defendants' prior refusal to produce organizational chart information or equivalent documents sufficient to identify the relevant managerial persons and their 2-3

---

[1] Rule 37 states, "An objection must state whether any responsive materials are being withheld on the basis of that objection." F.R.C.P. 34(b)(2)(C). The Committee Notes explain, "[t]his amendment should end the confusion that frequently arises when a producing party states several objections and still produces information, leaving the requesting party uncertain whether any relevant and responsive information has been withheld ...."

subordinates most involved and knowledgeable regarding (1) the decision to implement MoCA (whether under any other name or description), (2) licensing with respect to the distribution of video within the home over coaxial cable, (3) the MoCA functionality of the accused products, (4) the MoCA certification for the accused products, and (5) marketing going back to earliest consideration of MoCA, precipitated the dispute with respect to this topic.

The evening before this letter was due, Defendants agreed "to identify individuals knowledgeable about these topics from the time the decision to adopt MoCA was made for topic (1) above and from 2009-present for topics (2), (3) and (4) above." *See*, Ex. A, at p. 1. The Defendants are still refusing to identify individuals most knowledgeable regarding marketing of the Accused Products going back to the earliest consideration of MoCA, circa 2003. However, the identities of these individuals are very relevant because the business and marketing plans relating to the Accused Products were likely formulated in the early days of the adoption of the MoCA Specification.

Again, given that substantial completion of discovery deadline was July 15, 2016, TQ Delta requests that the Court order the Defendants to produce the information set forth in the attached order by October 3, 2016.

**_Patent Licenses_.** Defendants seek to unduly limit the production of relevant license agreements. Under *Georgia Pacific*, a damages expert may rely upon "comparable" license agreements. What is "comparable" surely extends beyond MoCA itself and the exact features of the asserted patents. Moreover, Plaintiff is entitled to make the "comparability" assessment for itself; that assessment should not be relegated to Defendants' counsel. In an effort to reach a reasonable compromise, Plaintiff has agreed to narrow its request to licenses "relating to the distribution of video within the home over coaxial cable." Defendants objected, but again failed to show an undue burden or explain what such technologies in the very same area cannot be considered "comparable." Finally, TQ Delta's request is narrowly tailored. For example, TQ Delta is not seeking licenses relating to HDMI, Wi-Fi, Bluetooth, USB and any other interfaces found on the Accused Products. TQ Delta respectfully requests that the Court order the Defendants to produce the licenses set forth in the proposed order.

**_Participation in the MoCA Alliance re the Subject Portions of the Standards_.** The Multimedia over Coax Alliance ("MoCA") is a trade group that was organized in part by the Defendants "to develop and promote [the MoCA] specifications for the transport of digital entertainment and information content over in-home coaxial environments, and to develop a certification process for products implementing such specifications to ensure interoperability between products and manufacturers." *See* Ex. B, at p. 1. Defendants' employees constitute the bulk of the MoCA Board of Directors and other MoCA work groups ("WGs"). *See* Ex. C. The BoD and the WGs consider technical proposals and enhancements to the MoCA Specifications, discuss and vote on technology proposals and develop certification and test plans used to confirm compliance of the Accused Products with the MoCA Specifications. The meeting minutes of the BoD and WGs are relevant to issues in this case. However, Defendants have failed to produce discovery regarding (1) the meeting minutes of the BoD and WGs; (2) the consideration and adoption of the pertinent sections of the MoCA Standard; and (3) tests, programs and documentation to determine whether the Accused Products are compliant with the pertinent sections of the MoCA Specification.

The discussion and meeting minutes related to the consideration and approval of the relevant MoCA Specifications are unquestionably relevant, as they evidence the value and benefits of the standardized technology over other alternatives. Defendants agreed to produce

these documents, but have so far failed to produce these documents and have suggested that they may not have these documents. *See*, Ex. D. This is hard to believe. Defendant, Comcast for example has been a member of MoCA since 2003. Any suggestion that Comcast, for example, has no meeting minutes in its possession rings hollow. Defendants should be ordered to produce all BoD and WGs meeting minutes, and similar documents directed to the consideration and adoption of the pertinent sections of the MoCA Standard; and (3) tests, programs and documentation to determine whether the Accused Products are compliant with the pertinent sections of the MoCA Specification, by October 3, 2016.

    ***Decision to implement MoCA.*** This topic includes documents relating to strategic plans, marketing plans, reports concerning demand for MoCA products, market research and other studies relating to MoCA, competition for the accused MoCA products, the consideration of and the decision to implement MoCA, the monetary and other benefits of MoCA, industry analyst reports regarding MoCA, and consideration and comparison of competing technologies.[2]

    These topics are undeniably relevant to at least the damages issues. By way of example, Defendants obviously undertook a study of the benefits of MoCA before undertaking to replace perhaps tens of thousands of non-MoCA set-top boxes with new, Accused MoCA Products. These analyses surely rose to high levels in the company, as the decision to swap out existing set top boxes to deploy the MoCA products involved an enormous capital expenditure – to address competitive threats from others who had deployed MoCA products. Those analyses reflect a consideration of the benefits of MoCA and the risks of not deploying MoCA products (*e.g.*, losing customers to competitors in a billions-of-dollars-per-year market). The documents surely reflect the benefits of MoCA versus conventional (non-MoCA) set top box products. Also, the Court appears to agree with TQ Delta that studies and analyses of the type requested are reasonable. *See* Ex. E ("find out whether your client has anything about why people pick whole home rather than direct point-to-point. If you've got something that fits that category, produce it.")

    Initially, Defendants refused to search for this information. *See* Ex. A, at p. 8. Now Defendants represent that they have searched for but have not found any relevant documents. *Id.*, at p. 2. But this is untenable. ██████████████████████████████████ ████████████████████████████ *See, e.g.*, Ex. F; and Ex. G. Notwithstanding Defendants' contention that they have searched for and not found relevant documents, TQ Delta respectfully requests an order from this Court is required to ensure that Defendants perform a thorough search for these documents and produce any relevant documents before October 10, 2016 or provide an undertaking to this Court that such a search was performed, including locations searched.

---

[2] *See, e.g.*, Requests For Production to Comcast nos. 38-42 (actual and forecasted units, revenues, costs, prices, profits); 43-45, 70-72, 102 (e.g., market research, business plans, and market analysis, forecasted prices/revenues, and benefits, competition for Accused Products); 43, 55 (Defendant's decisions to deploy, market and sell the Accused MoCA Products); 70-71 (capital expenditure authorization requests, studies, reports, business plans, forecasts, monetary and non-monetary benefits and advantages of the MoCA Products that provide whole home HD DVR and/or provides audio/visual content via coaxial cabling); 99 (individuals and dates for the decision to market Accused MoCA Products); 100 (high level summary documents sufficient to show the financial benefit/detriment of Accused Products); 102 (MoCA market studies); 103 (business plans for Accused MoCA Products and analysis of demand).

Respectfully submitted,

/s/ Michael J. Farnan

Michael J. Farnan

Cc: Counsel of Record (vial E-Mail)

# EXHIBIT A

REDACTED

# EXHIBIT B

**AMENDED AND RESTATED**

**CORPORATE BYLAWS**

**of**

**Multimedia Over Coax Alliance**

**(a nonprofit mutual benefit corporation)**

**February 22, 2013**

# TABLE OF CONTENTS

**Page**

ARTICLE I        OFFICES ..................................................................................................... 1

    1.1    Principal Office ................................................................................................ 1

    1.2    Other Offices ................................................................................................... 1

ARTICLE II       PURPOSES ............................................................................................... 1

    2.1    Purposes .......................................................................................................... 1

    2.2    Defined Terms ................................................................................................. 2

ARTICLE III      MEMBERSHIP .......................................................................................... 2

    3.1    Initial Class of Membership ............................................................................ 2

    3.2    Additional Class of Members ......................................................................... 2

    3.3    Participants ...................................................................................................... 3

    3.4    Promoter Membership Qualifications .............................................................. 3

    3.5    Admission to Promoter Membership ............................................................... 3

    3.6    Fees, Dues and Assessments ........................................................................... 4

    3.7    Termination of Membership ............................................................................ 4

        3.7.1    Resignation ....................................................................................... 4

        3.7.2    Expulsion of Promoter Member ........................................................ 4

        3.7.3    Expulsion of Voting Member ............................................................ 5

        3.7.4    Expiration .......................................................................................... 5

        3.7.5    Dues and Assessments ...................................................................... 5

        3.7.6    Termination or Expiration of the Voting Member Agreement or Participation Agreement ................................................................... 5

        3.7.7    Bankruptcy or Dissolution ................................................................ 5

    3.8    Non-Liability ................................................................................................... 5

    3.9    Non-Transferability ......................................................................................... 6

    3.10    Distribution of Assets Upon Dissolution ........................................................ 6

ARTICLE IV      MEMBERSHIP MEETINGS ..................................................................... 6

    4.1    Place of Meetings ............................................................................................ 6

    4.2    Regular Meetings ............................................................................................. 7

    4.3    Special Meetings ............................................................................................. 7

    4.4    Notice of Meetings .......................................................................................... 7

i

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 4.5 | Adjourned Meetings | 7 |
| 4.6 | Quorum | 7 |
| 4.7 | Voting Entitlement | 8 |
| 4.8 | Voting | 8 |
| 4.9 | Action Without Meeting by Written Ballot | 8 |
| 4.10 | Proxies | 8 |
| 4.11 | Conduct of Meetings | 9 |
| 4.12 | Meeting by Electronic Transmission | 9 |
| 4.13 | Meetings of Voting Members | 9 |
| ARTICLE V | BOARD OF DIRECTORS | 9 |
| 5.1 | Powers | 9 |
| 5.2 | Number and Composition of Board of Directors | 9 |
| 5.3 | Alternate Directors | 10 |
| 5.3.1 | Alternate Directors; Voting | 10 |
| 5.3.2 | Role of Alternate Director | 10 |
| 5.3.3 | Application of Bylaws | 10 |
| 5.4 | Observers | 10 |
| 5.5 | Restrictions on Eligibility to Serve as a Director; Control Groups | 11 |
| 5.6 | Vacancies | 11 |
| 5.7 | Place of Meeting | 11 |
| 5.8 | Special Meetings | 11 |
| 5.9 | Notice of Meetings; Attendance | 11 |
| 5.10 | Consent to Meetings | 11 |
| 5.11 | Action Without Meeting | 12 |
| 5.12 | Telephonic Meetings | 12 |
| 5.13 | Quorum | 12 |
| 5.14 | Voting | 12 |
| 5.15 | Adjournment | 12 |
| 5.16 | Fees and Compensation | 13 |
| 5.17 | Standard of Conduct | 13 |

# TABLE OF CONTENTS
### (continued)

**Page**

5.18 Self-Dealing Transactions ........................................................................ 13

    5.18.1 Membership Approval ........................................................... 13

    5.18.2 Board or Committee Approval ............................................. 13

    5.18.3 Just and Reasonable Contract .............................................. 14

5.19 Resignation and Removal ...................................................................... 14

    5.19.1 Resignation ........................................................................... 14

    5.19.2 Removal ................................................................................ 14

    5.19.3 Termination of Promoter Membership .................................. 14

    5.19.4 Removal of Appointing Promoter Member ........................... 14

5.20 Advisory Board ...................................................................................... 14

5.21 Merger of Alliance ................................................................................ 15

ARTICLE VI    OFFICERS ........................................................................ 15

6.1 Officers .................................................................................................. 15

6.2 Election .................................................................................................. 15

6.3 Removal and Resignation ...................................................................... 15

    6.3.1 Removal ................................................................................ 15

    6.3.2 Resignation ........................................................................... 15

6.4 Vacancies ............................................................................................... 15

6.5 President ................................................................................................. 16

6.6 Vice President ........................................................................................ 16

6.7 Chief Financial Officer or Treasurer ..................................................... 16

6.8 Secretary ................................................................................................ 16

ARTICLE VII    COMMITTEES ................................................................. 16

7.1 Appointment of Committees .................................................................. 16

    7.1.1 In General .............................................................................. 16

    7.1.2 Executive Committee and Other Committees with the Authority of the Board ....................................................................... 16

7.2 Powers and Authority of Committees .................................................... 17

ARTICLE VIII    AMENDMENTS TO IPR POLICY ................................ 17

8.1 The IPR Policy and Affiliates ................................................................ 18

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE IX      INDEMNIFICATION ................................................................. 18

    9.1      Actions Against Alliance Agents ................................................ 18

    9.2      Actions by the Alliance ............................................................. 18

ARTICLE X      MISCELLANEOUS ................................................................ 19

    10.1    Fiscal Year ................................................................................. 19

    10.2    Inspection of Corporate Records ............................................... 19

    10.3    Representation of Shares of Other Corporations ....................... 19

    10.4    Checks, Drafts, Etc ................................................................... 19

    10.5    Execution of Contracts .............................................................. 19

    10.6    Alliance Confidentiality Obligation .......................................... 19

    10.7    Corporate Loans, Guarantees and Advances ............................. 20

    10.8    Inspection and Disclosure ......................................................... 20

    10.9    Not For Profit Status ................................................................. 20

    10.10   Forms of Notice ........................................................................ 20

    10.11   Severability ............................................................................... 20

    10.12   Waiver of Fiduciary Duty .......................................................... 20

    10.13   Corporate Opportunities ............................................................ 21

ARTICLE XI      EFFECTIVE DATE AND AMENDMENT .............................. 21

    11.1    Effective Date ........................................................................... 21

    11.2    Amendments .............................................................................. 21

APPENDIX
    Definitions
    Voting Reference Chart 1
    Voting Reference Chart 2
    Voting Reference Chart 3

# AMENDED AND RESTATED

# CORPORATE BYLAWS

## of

## Multimedia Over Coax Alliance

## (a nonprofit mutual benefit corporation)

# ARTICLE I

## OFFICES

**1.1    Principal Office.**  The principal office for the transaction of the business of **Multimedia Over Coax Alliance** (the "*Alliance*") is fixed and located at 2400 Camino Ramon, Ste. 375, San Ramon, CA, USA 94583.  The Board of Directors of the Alliance is hereby granted full power and authority to change the said principal office from one location to another.

**1.2    Other Offices.**  Branch or subordinate offices may at any time be established by the Board of Directors at any place or places where the Alliance is qualified to do business.

# ARTICLE II

## PURPOSES

**2.1    Purposes.**  The Alliance is a California nonprofit mutual benefit corporation under the Nonprofit Mutual Benefit Corporation Law of the State of California, as set forth in Part 3 of Division 2 of Title 1 of the California Corporations Code, and any successor provision to such law (hereinafter, "Corporations Code") and is formed to develop and promote specifications for the transport of digital entertainment and information content over in-home coaxial environments, and to develop a certification process for products implementing such specifications to ensure interoperability between products and manufacturers.  The Alliance is an organization described in Section 501(c)(6) of the Internal Revenue Code ("IRC").

The specific purposes for which the Alliance is organized are to:

**2.1.1**    Bring about the existence of a broad range of interoperable consumer and industrial devices by promoting open specifications for the transport of digital entertainment and information content over coaxial networks;

**2.1.2**    Provide a forum and environment whereby the Alliance's members may meet to approve suggested revisions and enhancements to the relevant specifications; and provide a forum whereby users may meet with developers and providers of related products and services to identify requirements for interoperability and general usability;

**2.1.3**   Educate the business and consumer communities as to the value, benefits and applications for coaxial-based consumer products and services through public statements, publications, trade shows demonstrations, seminar sponsorships and other programs established by the Alliance;

**2.1.4**   Protect the needs of consumers and increase competition among vendors by supporting the creation and implementation of uniform conformance test procedures and processes that assure the interoperability of coaxial-based consumer products and services;

**2.1.5**   Maintain relationships and liaison with educational institutions, government research institutes, other technology consortia, and other organizations that support and contribute to the development of the specifications; and

**2.1.6**   Foster competition in the development of new products and services based on specifications developed by the Alliance in conformance with all applicable antitrust laws and regulations.

**2.2**   **Defined Terms.**   Capitalized terms not otherwise defined herein shall have the meaning set forth in under *DEFINITIONS* in the Appendix to these Bylaws.

# ARTICLE III

# <u>MEMBERSHIP</u>

**3.1**   **Initial Class of Membership.**   Subject to Section 3.2, there shall be only one (1) class of voting members in the Alliance, within the meaning of Section 5056 of the Corporations Code, and such voting members are referred to in these Bylaws as "***Promoter Members***." Each Promoter Member must execute and deliver a "***Promoter Member Agreement***" to the Alliance. The number of Promoter Members of the Alliance shall not exceed eleven (11), until such limit is changed by an amendment to this Bylaw section by the Board of Directors of the Alliance, by Super Majority vote.   The exact number of Promoter Members shall be fixed from time to time, within the limits of this section, by a resolution of the Board of Directors.

**3.2**   **Additional Class of Members.**   Notwithstanding Section 3.1 (Initial Class of Membership), the Board of Directors of the Alliance may, by a Unanimous Vote,, create one (1) or more new additional classes of voting members of the Alliance (with the Promoter Members and any such additional voting member classes collectively referred to as, "***Voting Members***" or such other name or classification as may be adopted by the Board of Directors).   In such event, the Board of Directors shall, as provided in and subject to these Bylaws, (i) amend these Bylaws and the IPR Policy (as defined in ARTICLE VIII of these Bylaws) as necessary to establish such other classes and to bestow upon such new voting class members the rights of membership in the Alliance as required by applicable law and as otherwise determined by the Board of Directors, and (ii) require, as a condition of membership in any new voting membership class, that all members of such new voting classes execute a member agreement with the Alliance setting forth the rights, privileges and obligations given and applicable to them and the conditions of their membership (together with Promoter Member Agreement collectively "***Voting Member Agreement***").   Such agreements will include (a) confidentiality and nondisclosure obligations at

least as restrictive as those applicable to Promoter Members and (b) the IPR Policy.  Each Voting Member that is not a Promoter Member shall have the same obligations and, except as modified by a Voting Member Agreement, rights under the IPR Policy as Promoter Members.  The Board of Directors of the Alliance may, by Majority Vote, establish reasonable dues and fees for membership in any Voting Member class.

**3.3     Participants.**  The Alliance may, pursuant to resolutions adopted by the Board of Directors by Unanimous Vote,, create one or more classes of non-voting participants of the Alliance (collectively, "***Participants***" or such other name or classification as may be adopted by the Board of Directors).  Notwithstanding the use of the term "member" or "membership" in these Bylaws or the applicable Participant Agreement, such non-voting classes shall not be considered "Members" under Corporations Code Section 5056.  The Board of Directors of the Alliance shall, by Unanimous Vote (within a reasonable time after the certification process and specification have been approved by the Board of Directors of the Alliance as "Approved Draft Deliverables" (as defined in the IPR Policy)) create a Participant class, whereby the Participants shall have the same rights as Promoter Members under the IPR Policy (as defined in ARTICLE VIII of these Bylaws) to request and receive the same intellectual property right licenses as Promoter Members with respect to the specifications approved by the Board of Directors, including, without limitation, those rights set forth in Section 5.1 (Rand Licenses) of the IPR Policy.  Participants shall have only the rights and privileges specifically given to them by the resolutions adopted by the Board of Directors, and shall be subject to any obligations and conditions imposed thereon by the Board of Directors.  Membership in the Participant class shall be open to all Persons, provided that each Participant shall be required to enter into a Participant Agreement with the Alliance (the "***Participant Agreement***") setting forth the rights, privileges, obligations and conditions related to participation in the Alliance.  Each Participant Agreement will include (i) confidentiality and nondisclosure obligations at least as restrictive as those applicable to Promoter Members and (ii) the IPR Policy.  Each Participant shall have the same obligations and except as modified by a Participant Agreement, rights under the IPR Policy as Promoter Members.  Participants shall not be entitled to any voting rights with respect to the business or proceedings of the Alliance, including without limitation, any matters relating to the adoption of a deliverable or any other matters presented to the Alliance, the Board of Directors and/or the Promoter Members for voting or election.  The Board of Directors of the Alliance may, by Majority Vote, establish reasonable dues and fees for membership in any Participant class.

**3.4     Promoter Membership Qualifications.**  Promoter Members of the Alliance shall be those entities listed on the Promoter Membership list as maintained by the Alliance from time-to-time.   Additional Promoter Members may be admitted pursuant to Section 3.5 (Admission to Promoter Membership).  A Promoter Member shall automatically cease to be a Promoter Member upon the occurrence of an event set forth in Section 3.7 (Termination of Membership).

**3.5     Admission to Promoter Membership.**  Upon Majority Vote of the Board of Directors, any Person may be invited to apply for Promoter Membership.  Admission of a new Promoter Member shall require a Super Majority Vote of the Board of Directors, and such a determination shall be based on the then-current criteria and conditions of membership adopted by the Board of Directors. Upon the Alliance's receipt of written notice from an Affiliate of a

Promoter Member in Good Standing that such Affiliate desires to join the Alliance as a Promoter Member, the Alliance and the Affiliate will enter into a Promoter Member Agreement and no vote of the Board of Directors will be required.   Notwithstanding the foregoing, any such Affiliate must execute an agreement binding such Affiliate to the terms in the IPR Policy as described in Section 8.1 (IPR Policy and Affiliates) of these Bylaws.

**3.6     Fees, Dues and Assessments.**   The Board of Directors shall determine the initial membership fees, dues and assessments for membership and/or participation in the Alliance, whether as a Voting Member or as a Participant.   For so long as a Promoter Member is an Alliance member in Good Standing, its Affiliates that are also Promoter Members shall not be required to pay the initial membership fee or any membership renewal fees.   Fees, dues and assessments for membership and participation in the Alliance may be increased or decreased by the Board, in its discretion, at any time.   Membership and participation in the Alliance will automatically renew on an annual basis.   Unless otherwise provided in the applicable Voting Member Agreement or the Participant Agreement, membership and participation fees will be invoiced at each subsequent anniversary period and Voting Members and Participants shall be obligated to make payment of annual fees, dues and assessments within thirty (30) calendar days of written notice of such fees, dues or assessments.   No *pro rata* refund of any membership or participation fees, dues or assessments shall be made upon termination of a Voting Member's membership or a Participant's participation in the Alliance.

**3.7     Termination of Membership.**   The membership of any Voting Member in the Alliance and the participation by any Participant in the Alliance shall terminate upon the occurrence of any one or more of the conditions set forth in this Section 3.7 (Termination of Membership).   Upon termination or expiration of the status of a Voting Member or a Participant in the Alliance, all rights, privileges and obligations associated with being a Promoter Member or Participant, as applicable, shall terminate, except those rights, privileges and obligations expressly set forth in the Voting Member Agreement or the Participant Agreement, as applicable, as surviving such termination or expiration.

**3.7.1     Resignation.**   A Voting Member or Participant may resign from the Alliance at any time by filing a resignation letter with the President or Secretary of the Alliance.

**3.7.2     Expulsion of Promoter Member.**   A Promoter Member may be expelled from the Alliance by a Majority Vote if (i) the Promoter Member has failed to attend three (3) consecutive meetings of the Promoter Members or (ii) the Promoter Member's Director or Alternate Director has failed to attend three (3) consecutive meetings of the Board of Directors. The vote to expel a Promoter Member may take place at the third meeting of the Promoter Members or of the Board of Directors missed by the Promoter Member or its Director or Alternate Director.   If grounds appear to exist for expulsion of a Promoter Member, the procedure set forth below shall be followed:

(a)     The Promoter Member shall be given fifteen (15) day's prior notice of the proposed expulsion and the reasons for the proposed expulsion.   Notice shall be given by any method reasonably calculated to provide actual notice. Any notice given by mail shall be sent by registered mail to the Promoter Member's last address as shown on the records of the corporation.

(b)     The Promoter Member shall be given an opportunity to be heard, either orally or in writing, at least five (5) days before the effective date of the proposed expulsion. The hearing shall be held, or the written statement considered, by the Board or by a committee or person authorized by the Board to determine whether the expulsion should take place.

(c)     The Board shall decide whether or not the Promoter Member should be expelled.

(d)     Any action challenging an expulsion of membership, including a claim alleging defective notice, must be commenced within one year after the date of the expulsion.

**3.7.3   Expulsion of Voting Member.**   In the event the Board of Directors establishes one or more additional classes of Voting Members, such Voting Members may be expelled under the procedures set forth in Section 3.7.2 above.

**3.7.4   Expiration.**   A membership or participation issued for a period of time shall expire when such period of time has elapsed unless the membership or participation is renewed, if at all, in accordance with the applicable renewal terms and conditions, if any.

**3.7.5   Dues and Assessments.**   Membership and participation shall terminate upon the failure of the Voting Member or Participant to pay any fees, dues or assessments within the time periods set forth in these Bylaws, as established by the Board of Directors or as set forth in the applicable Voting Member Agreement or Participant Agreement, except as otherwise agreed by a Majority Vote of the Board of Directors, provided that the Voter Member or Participant is given written notice of such failure and does not cure such failure within thirty (30) days after receipt of such notice.

**3.7.6   Termination or Expiration of the Voting Member Agreement or Participation Agreement.**   Membership or participation shall terminate upon termination or expiration of the applicable Voting Member Agreement or Participation Agreement, respectively.  A Voting Member Agreement or Participation Agreement may only be terminated by the Alliance (i) by Majority Vote of the Board of Directors in the case of a material breach of the Voting Member Agreement by a Voting Member or of the Participation Agreement by a Participant, or (ii) by a Super Majority Vote of the Board of Directors, (without including the vote of the Director appointed by the affected Voting Member), if such Voting Member's or Participant's actions were adverse to the interests of the Alliance or otherwise disruptive to the Alliance.

**3.7.7   Bankruptcy or Dissolution.**   Membership or participation shall terminate upon the bankruptcy, insolvency or dissolution of a Voting Member or Participant.

**3.8     Non-Liability.**   No Voting Member or Participant shall be personally liable for the debts, liabilities or obligations of the Alliance.

**3.9     Non-Transferability.**   No Voting Member and no Participant may transfer for value or otherwise its membership or participation in the Alliance or any right, privilege or obligation arising therefrom, except in connection with the assignment of its Voting Member Agreement or Participant Agreement, as applicable, as expressly provided in and subject to the

terms in such Agreements.

**3.10     Distribution of Assets Upon Dissolution.**  Upon a dissolution or liquidation of the Alliance, the Board of Directors shall, except as otherwise agreed by the Board of Directors in connection with a transaction described in Section 5.21 (Merger of Alliance), return to each Voting Member and each Participant all tangible forms of technology and intellectual property (including, without limitation software, documentation, other works of authorship, proprietary and confidential information and other trade secrets) provided to the Alliance by such Voting Member or Participant in tangible form, unless otherwise provided in a written agreement executed by the Alliance and the applicable Voting Member or Participant.  In addition, upon a dissolution or liquidation of the Alliance and after all of the known debts and liabilities of the Alliance have been paid or adequately provided for in accordance with Corporations Code Section 8713, the Board of Directors shall, subject to and as provided by all applicable laws:  (i) return to the Voting Members and the Participants any unused portions of dues paid by the Voting Members and Participants for any particular fiscal year; and (ii) thereafter, transfer remaining assets and/or intellectual property rights of the Alliance, such as any trademarks or logos of the Alliance, (a) to another IRC Section 501(c)(6) organization, as determined by the Board of Directors whose purposes are similar to the Alliance or (b) as otherwise required by applicable law.   Any such assets not disposed of in accordance with the aforementioned procedures shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Alliance is then located to such organization or organizations, as said court shall determine, that are organized and operated exclusively for such purposes.  No part of the Alliance's net earnings will inure to the benefit of any Voting Member, Participant, Director or any third person.  In addition, upon dissolution or liquidation of the Alliance, all Voting Member Agreements, Participation Agreements and any other agreements between the Alliance and any Voting Member or Participant shall terminate, except, in each case, for those obligations that survive such termination (e.g., confidentiality obligations) or as otherwise provided in such agreements.

# ARTICLE IV

## MEMBERSHIP MEETINGS

**4.1     Place of Meetings.**  All meetings of the Promoter Members shall be held at any place which may be designated by the Board of Directors pursuant to the authority hereinafter granted to the Board of Directors, or by the written consent of all Promoter Members entitled to vote at such meetings, given either before or after the meeting and filed with the Secretary of the Alliance.   The individual representing a Promoter Member at the meetings of the Promoter Members must be an employee, officer, or director of the Promoter Member or of an Affiliate of the Promoter Member, provided however, in the case of an Affiliate of the Promoter Member, the Affiliate must be bound by the terms in the IPR Policy for an employee, officer or director of such Affiliate to represent the Promoter Member at the meetings of the Promoter Members.

**4.2     Regular Meetings.**  Regular meetings of Promoter Members of the Alliance shall be held at such dates and at such times and places as determined by resolution of the Board of Directors, but in any event not less than once per calendar year.  Additional Promoter Member

meetings may be set as determined by the Board of Directors and pursuant to notification as defined in these Bylaws.

**4.3     Special Meetings.**  Special meetings of Promoter Members, for any lawful purpose or purposes whatsoever, may be called at any time by the President, the Board of Directors, or by twenty-five percent (25%) or more of the Promoter Members entitled to vote. Notice of such request must be submitted to the President, the Vice-President or Secretary.  The notice must state the business to be transacted at the special meeting.

**4.4     Notice of Meetings.**  A notice of each annual meeting and each special meeting shall be given to each Promoter Member by the President of the Alliance or, in case of his/her failure or refusal, by any other officer or any Director of the Alliance.  Each such notice shall specify: (a) the place, time, day and hour of the meeting or the date on which the ballot shall be returned, if applicable; and (b) in the case of special meetings, the nature of the business to be transacted at the meeting.  Such notice shall be given to every Promoter Member of the Alliance who, on the record date for notice of the meeting, is entitled to vote at the meeting.  Such notice shall be given at least ten (10) business days but no more than thirty (30) calendar days prior to the date fixed for such meeting; provided, however, that if notice is given by mail and is not sent first class, registered or certified mail, notice shall be given not less than twenty (20) calendar days before the meeting.  Notwithstanding the foregoing, in the case of a special meeting, such notice will be given, within five (5) calendar days from receipt of a proper request for a special meeting, to the Promoter Members entitled to vote at the meeting and which meeting shall be held not less than ten (10) calendar days nor more than thirty (30) calendar days after the receipt of such a request.

**4.5     Adjourned Meetings.**  Any Promoter Members' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of a simple majority (greater than 50%) of the Promoter Members, entitled to vote at the meeting, either present in person or represented by Proxy, but in the absence of a quorum no other business may be transacted at any such meeting.  Annual and special meetings may not be adjourned for more than thirty (30) calendar days to another time or place.  It shall not be necessary to give any such notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by an announcement at the meeting at which such adjournment is taken.  If after the adjournment a new record date is fixed for notice or voting, a notice of the adjourned meeting shall be given to each Promoter Member who, on the record date for notice of the meeting, is entitled to vote at the meeting.

**4.6     Quorum.**  The presence in person or by Proxy of two-thirds (2/3), rounding up to the nearest whole number, of the Promoter Members of the Alliance shall constitute a quorum for the transaction of business at any meeting of the Promoter Members unless specified otherwise herein.  The presence in person or by Proxy of all (100%) of the Promoter Members shall constitute a quorum for actions requiring Super Majority Vote or Unanimous Vote. The presence of an authorized representative of a Promoter Member, including its Proxy, shall constitute presence of the Promoter Member for purposes of determining the establishment of a quorum.

**4.7     Voting Entitlement.**  If a quorum of Promoter Members exists, then every act or

decision done or made by the Promoter Members shall be by Majority Vote and shall, if so voted, be regarded as the act of the Promoter Members, unless a lesser number of votes or a greater number of votes of Promoter Members is required, either by law, the Articles of Incorporation, or these Bylaws,, to approve such act or decision and in such event such lesser or greater number of votes will be required to take such action or make such decision. Notwithstanding anything to the contrary in these Bylaws, if these Bylaws require a Super Majority Vote or Unanimous Vote for a particular matter, then all Promoter Members must cast a vote or affirmatively abstain from the vote for such vote to be effective and valid.

**4.8     Voting.**  Each Promoter Member in Good Standing is entitled to one (1) vote on each matter submitted to a vote of the Promoter Members.  Affiliate members are not entitled to vote, unless designated as voting member.  Voting shall be by voice vote, unless the President of the Alliance directs such voting to be by ballot.  No single vote shall be split into fractional votes.  Cumulative voting shall not be authorized.

**4.9     Action Without Meeting by Written Ballot.**  Any action, which may be taken at any regular or special meeting of Promoter Members, may be taken without a meeting if the Alliance distributes a written ballot or an electronic ballot meeting the requirements of Section 10.10 (Forms of Notice) of these Bylaws to every Promoter Member entitled to vote on the matter and the vote of the Promoter Members pursuant to such written ballot meets the requirements of this Section 4.9.  Such ballot shall set forth the proposed action, provide an opportunity to specify approval or disapproval of any proposal, and provide a reasonable time within which to return the ballot to the Alliance.  Approval by written or electronic ballot shall be valid only (i) if the written ballot has been circulated pursuant to the Majority Vote of the Board of Directors, when the number of votes cast by ballot within the time period specified equals or exceeds a quorum of the Promoter Members, and the number of approvals equals or exceeds the number of votes that would be required to approve at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot or (ii) if the written ballot has not been circulated pursuant to the Majority Vote of the Board of Directors, when the number of votes cast by ballot within the time period specified equals or exceeds a Super Majority of the Promoter Members, and the number of approvals equals or exceeds a Super Majority Vote of the Promoter Members.  Ballots shall be distributed to Promoter Members in accordance with delivery and timing requirements set forth in Section 4.4 (Notice of Meetings). All ballots distributed shall indicate the number of responses needed to meet the quorum requirement and shall state the percentage of approvals necessary to pass the measure submitted. All written ballots distributed shall specify the time by which the ballot must be received in order to be counted.

**4.10     Proxies.**  Every Promoter Member entitled to vote at a meeting of the Promoter Members shall have the right to do so in person or by one or more agents authorized by a written proxy executed by such person or his/her duly authorized agent and filed with the Secretary of the Alliance (a "*Proxy*"); but no such Proxy shall be valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it specifies therein the length of time for which such Proxy is to continue in force.  Each Proxy must be an employee, officer or director of the Promoter Member or an Affiliate, provided however, in the case of an Affiliate of the Promoter Member, the Affiliate must be bound by the terms in the IPR Policy for an employee, officer or director of such Affiliate to be a Proxy.‐

**4.11    Conduct of Meetings.**  Meetings of Promoter Members shall be presided over by the President of the Alliance, or in his/her absence, by the Vice- President, and in the absence of both of them, by the chair chosen by a simple majority (greater than 50%) of the Promoter Members present.  The Secretary of the Alliance shall act as the secretary of all meetings of Promoter Members, provided that in his/her absence the presiding officer shall appoint another Promoter Member to act as acting secretary of the meeting.

**4.12    Meeting by Electronic Transmission.**  A meeting of the Promoter Members may be conducted, in whole or in part, by electronic transmission by and to the Alliance or by electronic video screen communication (1) if the Alliance implements reasonable measures to provide Promoter Members in person (or, if proxies are allowed, by proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the Promoter Members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with those proceedings, and (2) if any Promoter Member votes or takes other action at the meeting by means of electronic transmission to the Alliance or electronic video screen communication, a record of that vote or action is maintained by the Alliance. Any request by the Alliance to a Promoter Member pursuant to clause (b) of Corporations Code Section 20 for consent to conduct a meeting of Promoter Members by electronic transmission by and to the corporation, shall include a notice that absent consent of the Promoter Member pursuant to clause (b) of Corporations Code Section 20, the meeting shall be held at a physical location in accordance with Section 4.1.

**4.13    Meetings of Voting Members.**  In the event the Board of Directors establishes one or more additional classes of Voting Members, meetings of such Voting Members shall be conducted in accordance with this Article IV except to the extent otherwise provided by the Board of Directors in establishing such class of Voting Members.

# ARTICLE V

# <u>BOARD OF DIRECTORS</u>

**5.1    Powers.**  Subject to the limitations of the Articles of Incorporation, these Bylaws, and the Corporations Code and subject to the duties of Directors as prescribed by these Bylaws, all corporate powers shall be exercised by or under the authority of, and the business and affairs of the Alliance shall be controlled by, the Board of Directors.  The Board of Directors shall have the power to select and remove all officers, agents, employees and contractors, and to fix reasonable compensation thereof, to authorize and empower officers or agents to enter into contracts and other commitments on behalf of the Alliance, and to appoint and delegate responsibilities and authority to committees, officers and agents.

**5.2    Number and Composition of Board of Directors.**  The number of Directors shall be equal to the number of Promoter Members, provided however, if a Person is a Promoter Member by reason of being an Affiliate of a Promoter Member, such Affiliate shall not be counted in determining the number of Directors.  Each Promoter Member (other than an Affiliate of a then-current Promoter Member) shall designate one (1) individual to serve as a Director and one (1) individual to serve as an Alternate Director (as more specifically defined in Section 5.3.1 (Alternate Directors; Voting)) to serve on the Board of Directors.  A Promoter Member that is an

Affiliate of another then-current Promoter Member shall not have the right to designate a Director.  Each Director and Alternate Director designated by a Promoter Member must be an employee, independent contractor, officer, or director of the Promoter Member or of an Affiliate of the Promoter Member provided that, in the case of an independent contractor, such independent contractor must be approved by a Majority Vote of the Board of Directors provided however, in the case of an Affiliate of the Promoter Member, the Affiliate must be bound by the terms in the IPR Policy for an employee, officer or director of such Affiliate to be a Director or an Alternate Director designated by Promoter Member.  The following events shall result in automatic termination of an individual's status as a Director or Alternate Director:  (a) termination of such Director's, Alternate Director's employment, officer or director relationship with the Promoter Member or its Affiliate of which he/she was an employee, officer, or director; (b) termination of any contract between the Alliance and such independent contractor; (c) upon resolution by the Board of Directors removing the Director or Alternate Director for cause pursuant to Section 5.19.2 (Removal) and/or (d) resignation of the Director or Alternate Director.  Any vacancy in the Board of Directors shall be filled pursuant to Section 5.6 (Vacancies).  Each of the Director and Alternate Director shall serve a two (2) year term unless otherwise provided under this Section 5.2 (Number and Composition of Board of Directors).

**5.3     Alternate Directors.**   The following procedures shall apply to Alternate Directors:

**5.3.1   Alternate Directors; Voting.**  Each Director shall have an alternate to serve in the capacity of Director in the event of the death, resignation, removal or absence of the Director; such alternate shall be referred to as an "***Alternate Director***."  When serving in the capacity of Director, the Alternate Director shall have all the rights, privileges and responsibilities of the Director.  Alternate Directors shall be entitled to attend all regular and special meetings of the Board of Directors and shall have all rights (including voting rights) of the Director in the absence of the Director.

**5.3.2   Role of Alternate Director.**  In the event that the Alternate Director is serving as a Director due to the absence of the non-Alternate Director, such non-Alternate Director shall regain all of the rights, privileges and responsibilities of Director status upon the termination of his or her absence.  In the event that the Alternate Director is serving as a Director due to the death, resignation or removal of the Director, the Alternate Director shall immediately become a Director, and the corresponding position of Alternate Director shall be filled as provided in these Bylaws.

**5.3.3   Application of Bylaws.**  All provisions of these Bylaws apply equally to the Alternate Directors as to the Directors when the Alternate Director is filling the role of the Director, unless otherwise noted.

**5.4     Observers.**  In the event that neither the Director nor the Alternate Director is capable of serving due to absence or otherwise, the applicable Promoter Member shall have the right to appoint a non-voting observer to attend Board meetings.  Notwithstanding the foregoing, the Board of Directors may exclude an observer from all or any portion of a Board of Directors meeting to the extent necessary to maintain an attorney-client privilege or otherwise protect confidential information or proceedings of the Alliance.

**5.5     Restrictions on Eligibility to Serve as a Director; Control Groups.**  No more than one (1) individual employed by or affiliated with an entity that constitutes a Control Group (as defined below) shall be permitted to serve as a Director or Alternate Director of the Alliance at one time.  "***Control Group***" shall include a Promoter Member and all Affiliates.

**5.6     Vacancies.**  If there is a Director vacancy which is not filled by an Alternate Director pursuant to Section 5.3 (Alternate Directors) and/or upon the vacancy of an Alternate Director, the affected Promoter Member shall have thirty (30) calendar days from the date of notice of the vacancy from the Alliance to appoint a replacement Director and/or Alternate Director to the Board of Directors for the remaining term.  Until a Promoter Member appoints a new Director or Alternate Director as provided above to attend Board of Director meetings, such Promoter Member shall not be represented on the Board of Directors as provided in Section 5.2 (Number and Composition of Board of Directors) for purposes of votes taken by the Board of Directors.  Such Promoter Member shall continue to have all the other rights, privileges and obligations of a Promoter Member under these Bylaws.  By way of example, if ten (10) Directors comprise the Board of Directors (because there are 10 Promoter Members), and a Promoter Member fails to appoint a Director as provided in this Section, then any proposal requiring a Super Majority Vote of the Board of Directors shall require eight (8) votes for approval, instead of the nine (9) votes that would have been required had the Promoter Member appointed a new Director, and any proposal requiring a Unanimous Vote shall require nine (9) votes for approval instead of ten (10).

**5.7     Place of Meeting.**  All meetings of the Board of Directors may be held at any place that has been designated from time to time by the Board of Directors or by the notice of the President.

**5.8     Special Meetings.**  Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the President, the Secretary or by any two (2) of the Directors.

**5.9     Notice of Meetings; Attendance.**  Notice of the time and place of each meeting of the Board of Directors not fixed by an express provision of these Bylaws or by a resolution of the Board of Directors shall be given to each Director not less than seventy-two (72) hours before the date of the meeting if given personally, by telephone or by electronic means including e-mail, and not less than four (4) business days before the date of the meeting if given by first-class mail.

**5.10     Consent to Meetings.**  The transactions of the Board of Directors at any meeting called without adequate notice shall be as valid as though done at a meeting duly held after call and notice if a quorum be present and before or after the meeting each Director not present: (a) signs a written waiver of notice; (b) signs a consent to the holding of such meeting; or (c) approves the minutes thereof.  Each Director who attends the meeting without protesting, prior thereto or at its commencement, shall be deemed conclusively to have consented to the holding of the meeting and to have waived the lack of notice to such Director.  All such waivers, consents or approvals shall be filed with the corporate records and made a part of the minutes of the meeting.

**5.11    Action Without Meeting.**  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all members of the Board of Directors shall individually or collectively consent in writing to such action.  Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors.  Such action by written consent shall have the same force and effect as a Unanimous Vote of such Directors.  Any certificate or other document filed under any provision of the Corporations Code which relates to action so taken shall state that the action was taken by unanimous written consent of the Board of Directors without a meeting, and that the Bylaws authorize the Directors to so act.  For the purposes of this Section only, "all members of the Board" shall not include any Interested Director.  For avoidance of doubt, the Board of Directors may not take any action without a meeting unless approved by unanimous written consent; if unanimous written consent is not obtained, the action remains unapproved.

**5.12    Telephonic Meetings.**  Pursuant to Corporations Code Section 7211(a)(6), Directors may participate in a meeting through use of conference telephone or electronic video screen, so long as all Directors participating in such meeting can hear one another.  Participation in a meeting through use of telephone or similar communications equipment shall constitute presence in person at such meeting.

**5.13    Quorum.** Two-thirds (2/3), rounding up to the nearest whole number, of the Directors then in office shall be necessary to constitute a quorum for the transaction of business or otherwise undertake any action or decision of the Board of Directors, except to adjourn as hereinafter provided in Section 5.15 (Adjournment); provided, however, that all of the Directors then in office shall be necessary to constitute a quorum for any action requiring a Super-Majority Vote or Unanimous Vote.

**5.14    Voting.**  If a quorum of Directors exists, then except for such lesser or greater number of votes that may be required pursuant to these Bylaws, the law, or the Promoter Member Agreement, decisions or actions done or made by the Directors shall be by Majority Vote.  If a lesser or a greater number of votes of Directors is required by the Articles of Incorporation, these Bylaws, or Promoter Member Agreements, to approve such act or decision, then in such event the lesser or greater number of votes will be required to take such action or make such decision.  Notwithstanding anything to the contrary in these Bylaws, if these Bylaws require a Super Majority Vote or Unanimous Vote for a particular matter, then all Directors must cast a vote or affirmatively abstain from the vote for such vote to be effective and valid.

**5.15    Adjournment.**  A Simple Majority of the Directors present, whether or not a quorum is present, may adjourn any Directors' meeting to meet again at another time or place.  In the event a meeting of the Board of Directors is adjourned for more than forty-eight (48) hours, notice of any adjournment to another time or place shall be given prior to the time set for the rescheduled meeting to the Directors who were not present at the time of the adjournment.

**5.16    Fees and Compensation.**  Directors shall serve without compensation, but by resolution of the Board of Directors, may be reimbursed for expenses paid while acting on behalf of the Alliance and/or expenses incurred in attending meetings of the Board of Directors.  Nothing herein contained shall be construed to preclude any Director from serving the Alliance in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation

therefore so long as such compensation is approved by a Majority Vote of Directors, excluding any Interested Director.

**5.17     Standard of Conduct.**   Pursuant to Corporations Code Section 7231, a Director (and Alternate Director, as applicable) shall perform the duties of a Director, including duties as a member of any committee or working group upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interests of the Alliance and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.   In performing the duties of a Director, a Director or Alternate Director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

**5.17.1** One or more officers or employees of the Alliance whom the Director believes to be reliable and competent in the matters presented;

**5.17.2** Legal counsel, independent accountants or other professionals as to matters which the Director believes to be within such person's professional or expert competence; or

**5.17.3** A committee of the Board upon which the Director does not serve, as to matters within the committee's designated authority, which committee the Director believes to merit confidence; provided that, in any such case, the Director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

**5.18     Self-Dealing Transactions.**   Pursuant to Corporations Code Section 7233, no Self-dealing Contract shall be void or voidable because an Interested Director or corporation, firm or association are parties or because such Interested Director(s) are present at the meeting of the Board or committee which authorizes, approves or ratifies the Self-dealing Contract, if:

**5.18.1 Membership Approval.**   All material facts are fully disclosed to or otherwise known by the Promoter Members and the Self-dealing Contract is approved by the Promoter Members in good faith including the abstention from voting by any membership owned by such Interested Director(s);

**5.18.2 Board or Committee Approval.**   All material facts are fully disclosed to or otherwise known by the Board or committee and the Board or committee authorizes, approves, or ratifies the Self-dealing Contract in good faith (including the abstention from voting by the Interested Director(s)), and, in the case of a Self-dealing Contract described above, the Board or committee resolves and finds that the contract is just and reasonable at the time it is authorized, approved or ratified; or

**5.18.3 Just and Reasonable Contract.**   The person asserting the validity of the Self-dealing Contract sustains the burden of proving that the contract was just and reasonable as to the Alliance at the time it was authorized, approved or ratified.

Interested Director(s) may be counted in determining the presence of a quorum at a meeting of the Board or a committee thereof, which authorizes, approves or ratifies a contract or transaction

as provided in this Section 5.17 (Self-Dealing Transaction).

### 5.19   Resignation and Removal.

**5.19.1  Resignation.**  Any Director or Alternate Director may resign at any time by giving written notice to the Board of Directors, to the President or to the Secretary of the Alliance.

**5.19.2  Removal.**  Any Director and/or Alternate Director may be removed upon resolution by the Board of Directors terminating such individual's status as such a Director or Alternate Director for any of the following, all of which constitute removal for cause, providing the resolution shall be adopted by Super Majority Vote:  (a) two (2) or more "unexcused absences" of the Director (without attendance by the Alternate Director) from Board of Directors meetings during any year; (b) conviction or entry of a plea of *nolo contendere* by such Director or Alternate Director for a felony crime; (c) intentional breach of fiduciary duties by such Director or Alternate Director; (d) public disparagement or ridicule of the Alliance by such Director or Alternate Director; (e) gross mismanagement or waste by such Director or Alternate Director or (f) violates the Alliance's antitrust guidelines or jeopardizes the non-profit, tax exempt status of the Alliance.   Upon termination of an individual's status as a Director or Alternate Director or if there is otherwise a vacancy on the Board of Directors, the vacancy may be filled pursuant to Section 5.6 (Vacancies).  For the purposes of this Section 5.19.2, an absence from a meeting of the Board of Directors shall be an "unexcused absence" if the Director has not, at least 24 hours prior to the meeting, provided the other Directors with notice that neither the Director nor the Alternate Director can attend the meeting and the reason for such absence.

**5.19.3  Termination of Promoter Membership.**  Each Director and Alternate Director's rights and privileges shall terminate and they shall cease being Directors at such time as the Promoter Member he/she represents ceases being a Promoter Member.

**5.19.4  Removal by Appointing Promoter Member.**  Any Director may be removed at any time, with our without cause by the Promoter Member who appointed such Director.

**5.20   Advisory Board.**  The Board of Directors may, at its sole discretion, appoint a board of advisors ("***Advisory Board***") with which the Board of Directors shall consult on matters relating to the operation of the Alliance.  The members of the Advisory Board shall not have the rights or privileges of Directors or Promoter Members as set forth in Corporations Code Sections 5047 and 5056 and shall have no power or authority over the operation of the Alliance.  The Advisory Board may be restructured and/or terminated by resolution of the Board of Directors at any time.  A member of the Advisory Board may be removed at any time by the Board of Directors in its sole and absolute discretion.

**5.21   Merger of Alliance.**  Any decision to merge the Alliance with another entity, or to sell all or substantially all of the assets of the Alliance to a third party or to otherwise effectuate a change in control of the Alliance (each one of the foregoing being referred to herein as a "***Merger Transaction***") shall require the Unanimous Vote of the Board of Directors and in such event the Board of Directors will amend these Bylaws as necessary to effectuate the Merger

Transaction, including without limitation taking into account the terms in Section 3.9 (Non-Transferability) and Section 3.10 (Distribution of Assets Upon Dissolution).

# ARTICLE VI

# OFFICERS

**6.1** **Officers.** The principal officers of the Alliance shall be a President, Vice President, Chief Financial Officer or Treasurer, and Secretary and such other officers as the Board of Directors may appoint. One person may hold two or more offices. Officers of the Alliance may be any person nominated, and elected as specified in Section 6.2 (Election), by a Director and nothing herein shall require such individual to be a Director or an employee or duly authorized representative of any Promoter Member of the Alliance.

**6.2** **Election.** The officers of the Alliance shall be appointed by Majority Vote of the Board of Directors in accordance with this ARTICLE VI, and each officer shall hold his or her office for a term of one (1) year, or until he or she shall resign or shall be removed or his or her successor shall be elected and qualified. Elections shall be held in April, with the one (1) year term beginning in April.

**6.3** **Removal and Resignation.**

**6.3.1** **Removal.** Any officer may be removed at any time, either with or without cause, by a Majority Vote of the Board of Directors or by any officer upon whom such power of removal may be conferred by the Board of Directors.

**6.3.2** **Resignation.** Any officer may resign at any time by giving written notice to the Board of Directors or the Secretary of the Alliance. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation shall not prejudice the rights of the Alliance under any contract to which the officer is a party.

**6.4** **Vacancies.** A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled by the Board of Directors for the unexpired term.

**6.5** **President.** The President shall serve as the Chief Executive Officer of the Alliance. Subject to the control of the Board of Directors, the President shall have general supervision, direction and control of the business and affairs of the Alliance. The President shall serve as an *ex officio* voting member of all committees, and shall have such other powers and duties as may be designated from time to time by the Board of Directors. The President shall preside at all meetings of the Board of Directors. If the President is also the person designated by a Promoter Member to vote on behalf of the Promoter Member, then the President shall be entitled to vote on matters submitted to a vote of the Promoter Members, and in such event, in no case is the President entitled to more than one vote on matters submitted to the Promoter Members for a vote.

**6.6     Vice President.**   In the absence of the President, or in the event of his or her inability or refusal to act, the Vice President shall perform all the duties of the President, and when so acting shall have all the powers of, and be subject to all the restrictions on, the President.   The Vice President shall have such other powers and duties as may be designated from time to time by the Board of Directors or the President.   There shall be no limit on the number of Vice Presidents that may be appointed by the Board of Directors.

**6.7     Chief Financial Officer or Treasurer.**   The Chief Financial Officer or Treasurer shall oversee the financial and accounting matters of the Alliance with respect to the receipt and deposit of funds.   The Chief Financial Officer or Treasurer shall have such other powers and duties as may be designated from time to time by the Board of Directors.

**6.8     Secretary.**   The Secretary shall keep a full and complete record of the proceedings of the Board of Directors, shall keep the seal (if one is maintained) of the Alliance and affix it to such papers and instruments as may be required in the regular course of business, shall make service of such notices as may be necessary or proper, and shall supervise the keeping of the records of the Alliance.   The Secretary shall have such other powers and duties as may be designated from time to time by the Board of Directors.

# ARTICLE VII

# <u>COMMITTEES</u>

**7.1     Appointment of Committees.**

**7.1.1   In General.**   The Board of Directors may create committees as the Board from time to time deems necessary or appropriate to conduct the business and further the objectives of the Alliance.   Such committees shall have the responsibilities and duties established by the Board of Directors.   Any such committees may be restructured and/or terminated by the Board of Directors at any time.

**7.1.2   Executive Committee and Other Committees with the Authority of the Board**.   Pursuant to Corporations Code Section 7212, the Board of Directors may appoint an Executive Committee and such other standing or special ad hoc committees and delegate to such committees such authority of the Board for purposes delegated by the Board as the Board from time to time deems necessary or appropriate to conduct the business and further the objectives of the corporation, provided that such delegation shall not include powers specified in Corporations Code Section 7212 (a)(1)–(a)(8).   The appointment by the Board of an Executive Committee and any other committee having the authority of the Board shall be by resolution adopted by a Majority of Directors then in office, provided that a quorum is present.   The Executive Committee and any other committee having authority of the Board shall be comprised of two (2) or more Directors and shall not include as members any individual who is not a Director.   The minimum number of Directors on the Executive Committee is three (3).   The purpose of the Executive Committee shall be to approve matters relating to Alliance business which require action prior to the next meeting of the Board of Directors, which matters are specified  in the resolution adopted by the Board, and such authority shall expire on the occurrence of the next meeting of the Board of Directors unless contained in a continuing resolution adopted by a

Majority of Directors then in office, provided that a quorum is present.  Any action taken by the Executive Committee shall be reported to the Board of Directors at its next meeting for review and ratification by the full Board of Directors.

      **7.2**     **Powers and Authority of Committees.**  Without limiting the generality of Section 7.1 (Appointment of Committees), the Board of Directors may delegate to any committee established under Section 7.1.2 any of the powers and authority of the Board of Directors in the management of the business and affairs of the Alliance, except the following:

      **7.2.1**   The approval of any action for which the Corporations Code also requires the approval of Voting Members of a corporation;

      **7.2.2**   The filling of vacancies on the Board or in any committee that has the authority of the Board;

      **7.2.3**   The fixing of compensation of the Directors for serving on the Board or on any committee;

      **7.2.4**   The amendment or repeal of these Bylaws, the IPR Policy, the Promoter Agreements, or the Articles of Incorporation of the Alliance or the adoption of new or replacement (i) Bylaws, (ii) IPR Policy, (iii) Promoter Agreements or (iv) Articles of Incorporation;

      **7.2.5**   Any action requiring a Super Majority Vote or Unanimous Vote of the Board of Directors of the Promoter Members;

      **7.2.6**   The amendment or repeal of any resolution of the Board, which by its express terms is not so amendable or repealable; and

      **7.2.7**   The appointment of committees of the Board or the members thereof.

# ARTICLE VIII

## AMENDMENTS TO IPR POLICY

      The Board of Directors may, only by Unanimous Vote, (i) amend the Alliance Intellectual Property Rights Policy ("***IPR Policy***"), (ii) implement or approve a new IPR Policy, including without limitation a new IPR Policy for a new member class or non-member class or otherwise, (iii) implement or approve the lack of an IPR Policy for a new member class or non-member class, or (iv) terminate, remove or revoke the IPR Policy in whole or in part.

      **8.1**    **The IPR Policy and Affiliates**.  The Board of Directors may, by Unanimous Vote, in connection with an entity joining the Company as a Voting Member or a Participant (e.g., an Associate of the Alliance or a Contributor of the Alliance) exempt certain Affiliates (as defined in DEFINITIONS) of such Voting Member or Participant from certain of the obligations otherwise imposed on Affiliates of Voting Members and Participants, including those obligations under the IPR Policy.  The Board of Directors may, in its discretion, impose such restrictions,

limitations and conditions on such Voting Members and Participants as the Board of Directors deems reasonable and appropriate.  Such restrictions, limitations and conditions may be different among such entities so joining the Company.

# ARTICLE IX

# INDEMNIFICATION

**9.1      Actions Against Alliance Agents.**   To the extent permitted by law, the Alliance shall indemnify any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Alliance or an action for self-dealing brought under Corporations Code Section 5233 made applicable pursuant to Corporations Code Section 7238) by reason of the fact that such person is or was a Director, Alternate Director, officer, employee or agent of the Alliance, or is or was a member of a working group, committee or subcommittee, or is or was serving at the request of the Alliance as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with such proceeding if such person acted in good faith and in a manner such person reasonably believed to be in the best interests of the Alliance and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of such person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in the best interests of the corporation or that the person had reasonable cause to believe that the person's conduct was unlawful.

**9.2      Actions by the Alliance.**   To the extent permitted by law, the Alliance may indemnify any person who was or is a party, or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Alliance or an action for self-dealing brought under Corporations Code Section 5233 of made applicable pursuant to Corporations Code Section 7238 to procure a judgment in its favor by reason of the fact that such person is or was a Director, Alternate Director, officer, employee or agent of the Alliance, or is or was a member of a working group, committee or subcommittee, or is or was serving at the request of the Alliance as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such action if such person acted in good faith, in a manner such person believed to be in the best interests of the Alliance and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances, provided that no indemnification shall be made in respect to any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his or her duties to the Alliance, unless, and only to the extent that, the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper.

# ARTICLE X

# <u>MISCELLANEOUS</u>

**10.1    Fiscal Year.**   The fiscal year of the Alliance shall end on the last day of December of each year.

**10.2    Inspection of Corporate Records.**   The books of account and minutes of the proceedings of the Board of Directors, and of any committees of the Board of Directors, shall be open to inspection at the principal office of the Alliance by each Promoter Member at any reasonable time upon the written demand of any Promoter Member.   Such inspection may be made in person or by an agent or attorney, and shall include the right to make photocopies and extracts at the requesting Promoter Member's expense.

**10.3    Representation of Shares of Other Corporations.**   Any officer of the Alliance is authorized to vote, represent and exercise on behalf of the Alliance all rights incident to any and all shares of any other corporation or corporations standing in the name of the Alliance.   The authority herein granted to said officers may be exercised by such officers in person or by other persons authorized to do so by proxy duly executed by such officers.

**10.4    Checks, Drafts, Etc.**   All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness issued in the name of or payable to the Alliance and any and all securities owned by or held by the Alliance requiring signature for transfer shall be signed or endorsed by such person or persons and in such manner as from time to time shall be determined by the Board of Directors.

**10.5    Execution of Contracts.**   The Board of Directors may authorize any officer, employee, or agent to enter into any contract or execute any contract or execute any instrument in the name of and on behalf of the Alliance and such authority may be general or confirmed to specific instances.   Unless so authorized by the Board of Directors, no officer, agent, or employee shall have any power or authority to bind the Alliance by any contract or engagement or to pledge its credit or to render it liable for any purpose or in any amount.

**10.6    Alliance Confidentiality Obligation.**   The Alliance may only provide access to a Voting Member's or Participant's confidential information in accordance with and subject to the terms in the Voting Member Agreement or Participant Agreement, as applicable.   Any entity or person with access to confidential or proprietary information owned by the Alliance must execute a written confidentiality agreement with the Alliance with terms that are as least as restrictive as the confidentiality terms imposed on Voting Members and Participants.

**10.7    Corporate Loans, Guarantees and Advances.**   The Alliance shall not make any advances or make any loan of money or property to or guarantee the obligation of any Director or officer of the Alliance.

**10.8    Inspection and Disclosure.**   The Alliance shall keep or cause to be kept correct and complete books and records of account and shall also keep minutes of the proceedings of the Board of Directors or other documents as may be required by law on its own behalf.   The

Alliance shall have available for inspection by Promoter Members at the Alliance's principal office a copy of its three (3) most recent annual exempt organization information returns and a copy of its application for recognition of exemption and determination letter.

**10.9     Not For Profit Status.**   Neither the Alliance nor any of its Voting Members or Participants shall individually or collectively, directly or indirectly, engage in any act that will result in the loss of, or otherwise adversely affect, its status as a tax-exempt organization under the United States Internal Revenue Code.

**10.10     Forms of Notice.**   Any notice or writing required or permitted under these Bylaws may be given in writing, in person, by first class mail, by private carrier, by telephone, or electronic transmission.   Notice given by electronic transmission shall be valid only if (a) delivered by (1) facsimile telecommunication or electronic mail when directed to the facsimile number or electronic mail address, respectively, for that recipient on record with the Alliance, (2) posting on an electronic message board or network which the Alliance has designated for those communications, together with a separate notice to the recipient of the posting, which transmission shall be validly delivered upon the later of the posting or delivery of the separate notice thereof, or (3) other means of electronic communication, (b) to a recipient who has provided an unrevoked consent to the use of those means of transmission for communications under or pursuant to this code, and (c) that creates a record that is capable of retention, retrieval, and review, and that may thereafter be rendered into clearly legible tangible form.   However, an electronic transmission to a Promoter Member of the Alliance who is a natural person, and if an officer or director of the Alliance, only if communicated to the recipient in that person's capacity as a member, is not authorized unless, in addition to satisfying the requirements of this section, the consent to the transmission has been preceded by or includes a clear written statement to the recipient as to (a) any right of the recipient to have the record provided or made available on paper or in nonelectronic form, (b) whether the consent applies only to that transmission, to specified categories of communications, or to all communications from the Alliance, and (c) the procedures the recipient must use to withdraw consent.

**10.11     Severability.**   The invalidity of any clause, provision, or Article of these Bylaws shall not affect the validity or enforceability of the remaining clauses, provisions or Articles.

**10.12     Waiver of Fiduciary Duty.**   The Alliance hereby eliminates the personal liability of each member of the Board of Directors to the Alliance and the Alliance members for monetary damages for breach of fiduciary duty as a Director to the maximum extent permitted by applicable law.   If at any time in the future the applicable law is amended to authorize corporate action further eliminating or limiting the personal liability of Directors, the liability of a Director of the Alliance shall be eliminated or limited to the fullest extent permitted by then-applicable law, consistent with these Bylaws.

**10.13     Corporate Opportunities**.   Neither Promoter Members and their Affiliates, other Voting Members of the Alliance and their Affiliates, nor Participants and their Affiliates shall have any obligation whatsoever to present corporate opportunities to the Alliance or any of its Promoter Members, other Voting Members or Participants, and neither Promoter Members and their Affiliates, other Voting Members of the Alliance and their Affiliates, nor Participant and their Affiliates shall be required to refrain from engaging or investing in any business or entity,

including businesses or entities which are competitive with the Alliance or any of its Promoter Members, other Voting Members or Participants.

# ARTICLE XI

## EFFECTIVE DATE AND AMENDMENT

**11.1    Effective Date.**  These Bylaws shall become effective immediately upon their adoption.  Amendments to these Bylaws shall become effective immediately upon their adoption unless the Board of Directors of the Alliance in adopting them provide that they are to become effective at a later date.

**11.2    Amendments.**  These Bylaws may be amended only by a Super Majority Vote of the Board of Directors unless (i) the specific provision(s) of these Bylaws being amended sets forth a greater number of affirmative votes for an action, in which case any amendments to such provision(s) shall require the greater number of affirmative votes set forth in such provision(s) (e.g., if a provision of these Bylaws states that the Unanimous Vote of the Directors is required to take a certain action (e.g., amending the IPR Policy), then such provision may only be amended by a Unanimous Vote of the Directors;; or (ii) the specific provision(s) of these Bylaws being amended reserves any right or power to the Voting Members or a class of Voting Members, in which case such amendment shall require the approval by the vote of Voting Members or class of Voting Members required by the Bylaws provision being amended.  This Section 11.2 (Amendments) may only be changed by Unanimous Vote of the Board of Directors.

## CERTIFICATE OF SECRETARY

These Amended and Restated Bylaws were adopted by resolution approved by the Super Majority Vote of the Board of Directors on _____, 2012.

_____
Secretary

# APPENDIX

# DEFINITIONS

***Affiliate*** shall mean any corporation, partnership or legal entity directly or indirectly controlling or controlled by, or under direct or indirect common control with any other corporation, partnership or legal entity. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlling", "controlled by" and "under common control with"), as used with respect to any other corporation, partnership or other legal entity, shall mean the possession, direct or indirect, of the power to direct or cause the direction of the policies, operations, or activities of such other corporation, partnership or other legal entity, directly or indirectly, whether through the ownership of, or right to vote, or to direct the manner of voting of, voting securities, by law or agreement, or otherwise.

***Amendment to the Definition of Affiliate***. Notwithstanding the definition of "Affiliate" as set forth herein, the Board of Directors may, only by Unanimous Vote, amend the definition of the term "Affiliate" to have the following meaning (or a meaning that is substantially similar to the following meaning):"***Affiliate***" means any corporation or other business entity (i) in which the Voting Member or Participant owns or controls, directly or indirectly, more than fifty percent (50%) of the outstanding voting stock, voting equity interests or voting rights, (ii) which owns or controls, directly or indirectly, more than fifty percent (50%) of the outstanding voting stock, voting equity interests, or voting rights of the Voting Member or Participant (a "***Parent***"), or (iii) in which Parent owns or controls, directly or indirectly, more than fifty percent (50%) of the outstanding voting stock, voting equity interests or voting rights; but in a country where the local law does not permit foreign equity participation of more than fifty percent (50%), then an Affiliate includes any corporation or entity in which the Voting Member or Participant or its Parent owns or controls, directly or indirectly, the maximum percentage of outstanding voting stock, voting equity interests, or voting rights permitted by local law and such Voting Member or Participant or its Parent has the right to elect a majority of the board of directors (or other managing authority)."

***Draft Deliverable(s***) means Technical Specifications, Compliance Tests, field test plans, reports or other work product (i) prepared by the Alliance; or (ii) prepared by one or more Alliance Parties and delivered to the Alliance by the Technical Working Group responsible for such preparation as a submission for consideration by the Board for adoption as an Approved Draft Deliverable in accordance with Section 3 of this IPR Policy.

***Good Standing*** shall mean that the Promoter Member (i) is current in the payment of dues and fees to the Alliance, unless the Board of Directors has consented to or waived such non-payment, (ii) is not in material breach of its Promoter Agreement, and (iii) is not in violation of these Bylaws or any policies or procedures of the Alliance.

***Interested Entity*** shall mean: (i) any corporation, firm or association in which at least one of the Directors of such corporation, firm or association has a material financial interest; or (ii) any corporation, firm or association of which at least one of the directors of such corporation, firm or association is an Interested Director.

2/22/2013

**_Interested Director_** shall mean a director of a corporation, firm or association that is also a Director of the Alliance.

**_Majority Vote_** shall mean, for purposes of determining the number of votes cast by a Promoter Member or a Director, two-thirds (2/3), rounding up to the nearest whole number, of the Promoter Members (or their Proxies) or Directors (or Alternate Director, as applicable) present, as the case may be.

**_Person_** shall mean any individual, corporation, trust, limited liability company or other entity.

**_Proxy_** shall mean an alternate member representative that has the power to vote on behalf of such member.

**_Self-dealing Contract_**  shall mean any contract or transaction: (i) between the Alliance and at least one of the Alliance's Directors; or (ii) between the Alliance and any Interested Entity.

**_Simple Majority Vote_** shall mean, for purposes of determining the number of votes cast by Promoter at a Promoter Meeting or a Director at a Board of Directors meeting at which a quorum is present, more than 50% of the voting power present.

**_Super Majority Vote_** shall mean, for purposes of determining the number of votes cast by a Promoter Member at a Promoter Meeting or a Director at a Board of Directors meeting, the total number of then-existing Promoter Members or Directors, as the case may be, less the number one (1).  By way of example, if ten (10) Directors comprise the Board of Directors, any proposal requiring a Super Majority Vote of the Board of Directors shall require nine (9) affirmative votes for approval.

**_Unanimous Vote_** shall mean, for purposes of determining the number of votes cast by a Promoter Member or a Director, all Promoter Members or all Directors, as the case may be.  For the avoidance of doubt, the unanimous vote of all the Promoter Members (or their Proxies) or Directors (or the Alternate Directors, as applicable) present shall not be a Unanimous Vote if one or more Promoter Members (or their Proxies) or Directors (or their Alternate Directors), as the case may be, is missing or fails to cast a vote.

**_Voting Member_** shall mean the Person who has been admitted to the Alliance as a Voting Member and not the individual representing such Person.

## VOTING REFERENCE CHART 1
### (Refer to Bylaws Section for Detail)

| Bylaws Section | Matter to be Voted On | Number of Affirmative Votes Required |
|---|---|---|
| 4.4 Adjournment of Member Meeting | Adjournment of meeting | Vote of >50% Members present |
| 4.7  Member Voting | General Business Matters | 2/3 Majority Vote |
| 5.15 Adjournment of Board of Directors Meeting | Adjournment of meeting | Vote of >50% Directors present |
| 5.14 Director Voting | General Business Matters | 2/3 Majority Vote |
| 6.2 Election | Election of Officers | 2/3 Majority Vote |
| 6.3.1 Removal | Removal of Officers | 2/3 Majority Vote |
| IPR Policy | Approving Final Deliverables | 2/3 Majority Vote |
| 3.7.2 Expulsion of Promoter Member | Expulsion of Member Company from Promoter Membership | 2/3 Majority Vote |
| 3.7.6 Termination of the Voting Member Agreement or Participation Agreement | Termination of voting member agreement or participation agreement due to material breach | 2/3 Majority Vote |
| 5.16 Fees and Compensation | Approval for fees and compensation | 2/3 Majority Vote |
| 5.2 Number and Composition of Board | Approval of independent contractor as a Director | 2/3 Majority Vote |
| 11.2 Amendments | Amendment to Bylaws | Super Majority Vote |
| 3.5 Admission to Promoter Membership | Admission to Promoter Member | Super Majority Vote |
| 3.7.6 Termination of Voting Member Agreement or Participation Agreement | Termination of voting member agreement or participation agreement for disruption to Alliance | Super Majority Vote |
| 5.11 Action Without Meeting | Board of Directors Vote | Unanimous |

Multimedia Over Coax Alliance Confidential

2/22/2013

| 5.19.2 Removal of Director | Removal of a Director or Alternate | Super Majority Vote |
| Article VIII, Amendment to IPR Policy | Amendment to IPR Policy | Unanimous |
| 3.2 Additional Class of Voting Members | Create new Voting Member Classes | Unanimous |
| 3.3 Additional Class of Nonvoting Members (Participants) | Create one or more classes of non-voting participants | Unanimous |
| Definitions: Affiliate | Change definition of Affiliate | Unanimous |
| 3.10 Merger | Merger of Alliance | Unanimous |
| 3.5 Admission of Promoter Membership | Exempt Affiliate from IPR requirement | Unanimous |
| 3.5 Admission to Promoter Membership | Permitting Affiliate to join the Alliance as a Promoter Member, providing they are bound by the terms of the IPR Policy | No Vote required |

## VOTING REFERENCE CHART 2
## BOARD MEMBERS REQUIRED TO ESTABLISH QUORUM

| Total # Directors | Required to Establish Quorum |
|---|---|
| 6 | 4 |
| 7 | 5 |
| 8 | 6 |
| 9 | 6 |
| 10 | 7 |
| 11 | 8 |

## VOTING REFERENCE CHART 3
## VOTES REQUIRED TO APPROVE RESOLUTION, ONCE QUORUM IS ESTABLISHED

| Total Directors Present at Meeting | Simple Majority (>50%) | Majority (2/3) | Super Majority (n-1) (All Directors must be present) | Unanimous (All Directors must be present) |
|---|---|---|---|---|
| 6 | 4 | 4 | 5 | 6 |

Multimedia Over Coax Alliance Confidential

| 7 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|
| 8 | 5 | 6 | 7 | 8 |
| 9 | 5 | 6 | 8 | 9 |
| 10 | 6 | 7 | 9 | 10 |
| 11 | 6 | 8 | 10 | 11 |

# EXHIBIT C



(/index.htm)
About MoCA

# MoCA Members

## Promoters (Board of Directors)


(http://www.arrisi.com/)


(http://www.broadcom.com/)


(http://www.comcast.com)


(http://www.cox.com/)


(http://directv.com)


(http://www.echostar.com)


(http://www.intel.com)


(http://www.maxlinear.com)


(http://www.verizon.com)

## Contributors


(http://www.actiontec.com)


(http://www.alcatel-lucent.com)


(http://www.cablelabs.com)


(http://www.calcomp.com.tw/)


(http://complexiq.com)


(http://www.incoax.com/)


(http://www.lusterinc.com)


(http://www.mstarsemi.com/)


(http://www.timewarnercable.com)


(http://www.technicolor.com)


(http://www.vixs.com/)

## Associates:


(http://www.altech-multimedia.com/)


(http://www.askey.com.tw/)


(http://www.icbn.com.tw/)


(https://www.calix.com/)


(http://www.castlenet.com.tw/)


(http://dmt.kr/)


(http://www.hitrontech.com/)



(http://www.hollandelectronics.com/)


(http://www.humaxdigital.com/)


(http://www.kaonmedia.com/)


(http://www.mitrastar.com/)


(http://www.multichoice.com.za


(http://pdi-eft.com/)




(http://www.sagemcom.com/)

(http://www.samsung.com/us/index.html)

(http://www.sercomm.com/)


(http://www.spirent.com)

(http://smartrg.com/)

(http://www.tivo.com/)

(http://www.ubeeinteractive.com/)(http://www.wneweb.com/)

(https://www.yes.co.il/)

(http://www.yitong-group.com/)

(http://www.zteusa.com/)(http://www.zyxel.com/)

## ABOUT US

Board of Directors (/about/board.htm)     ›

Our Members (/about/members.htm)     ›

Organization Chart (/about/orgchart.htm)     ›

FAQs (/about/faqs.htm)     ›

MoCA Annual Report (/about/annual_report.htm)     ›

## Search

Search

🔍

MoCA technology is the fastest most reliable in-home backbone for Wi-Fi™

More MoCA information:

☑ *MoCA – Wikipedia (http://en.wikipedia.org/wiki/Multimedia_over_Coax_Alliance)*

☑ *MoCA for Consumers (http://www.mocainyourhouse.com/)*

### MoCA in the News

MoCA to challenge fiber, G.fast for in-building gigabit broadband (http://www.lightwaveonline.com/articles/2016/06/moca-to-challenge-fiber-g-fast-for-in-building-gigabit-broadband.html)

MoCA sees opportunity in group housing (http://www.broadbandtvnews.com/2016/06/09/moca-sees-opportunity-in-group-housing)     ›

MoCA enters broadband access market with MoCA Access (http://www.telecompaper.com/news/moca-enters-broadband-access-market-with-moca-access--1147722)     ›

MoCA Targets the Broadband Access Market (http://www.multichannel.com/news/distribution/moca-targets-broadband-access-market/405505)     ›

### News Releases

MaxLinear Announces Next Generation Multi-Gigabit MoCA 2.5 Single-Chip Home Networking Solution (http://www.mocalliance.org/news/prM_160809_MaxLinear-Announces-Next-Generation-Multi-Gigabit-MoCA-2-5-Single-Chip-Home-Networking-Solution)     ›

MoCA Enters Broadband Access Market (/news/prM_160608_MoCA_Enters_Broadband_Access_Market)     ›

Home Networking Gets a New Performance Standard (/news/prM_160416_MoCA-approved-specification-MoCA-2-5)     ›

MaxLinear, Celeno Develop Smart MoCA/Wi-Fi Extender Reference Solution Enabling Whole Home Gigabit Wi-Fi
(http://www.businesswire.com/news/home/20160209005724/en/MaxLinear-Celeno-Develop-Smart-MoCAWi-Fi-Extender-Reference)

⌃

Copyright © 2016 Multimedia over Coax Alliance. All Rights Reserved. Managed by: KMCreative (http://www.kmcreative.com)

f (https://www.facebook.com/MoCAlliance)　　🐦 (https://twitter.com/MoCAlliance)　　in (https://www.linkedin.com/groups?gid=136620)

▶ (https://www.youtube.com/MoCAlliance)

# EXHIBIT D

REDACTED

# EXHIBIT E

REDACTED

# EXHIBIT F

Comcast Expects Capex to Rise amid New Strategies and Competition

Comcast Expects Capex to Rise amid New Strategies and Competition PART 1 OF 14

# Key Business Trends for Comcast's Business in the Face of 2016

By Shirley Pelts | Dec 30, 2015 5:56 am EDT

Improving NPS score

At the UBS (UBS) Global Media and Communications Conference on December 7, 2015, Comcast Corporation's (CMCSA) chief financial officer, Michael J. Cavanagh, stated that the company's cable communications business is increasingly focusing on improving its NPS (net promoter scores). Previously, Comcast's NPS had been negative, but according to Net Promoter Network, net promoter scores are "using the answer to a single question, using a 0-10 scale: How likely is it that you would recommend [brand] to a friend or colleague?"

Comcast has taken many initiatives to improve its NPS, including trying to ensure that its technicians arrive on time at the customer's home and introducing an app for tracking the company's technician to improving its billing system.



As the chart above indicates, Comcast's cable communications business was a major component of the company's total revenues in 3Q15, with a 63% revenue share. The cable communications business saw revenues of $11.7 billion in 3Q15.

High-speed Internet

Comcast expects to end 2015 with double-digit growth in revenues from the company's high-speed Internet business. Cable communications had revenues of $3.1 billion for its

residential high-speed Internet business in 3Q15, which represents a growth of 10.2% year-over-year.

**Residential video**
The company's residential video revenues grew by 3.3% to $5.3 billion in 3Q15 as the company's video net customer losses improved drastically by 40.6% from 81,000 in 3Q14 to 48,000 in 3Q15—the best results in the third quarter for the company in the past nine years.

Comcast has stated that one of its goals in 2016 is to improve these video subscriber losses further and add more video subscribers on a year-over-year basis.

**Business services**
The business services of Comcast's Cable Communications business had revenues of $1.2 billion in 3Q15, a growth of ~20% over 3Q14. Comcast intends to grow this business further in 2016.

We will explore Comcast's business outlook in 2016 in detail further in subsequent parts of this series.

Comcast makes up approximately 2.6% of the PowerShares QQQ ETF (QQQ). For an investor interested in getting exposure to the television and radio sector, QQQ has around 4.4% exposure to the sector. QQQ also holds 5.0% of its total holdings in Alphabet (GOOG) and 8.4% of its total holdings in Microsoft (MSFT).

Continue to the next part for a closer look at Comcast's X1 platform.

---

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 2 OF 14**

# How Comcast's X1 Platform Is Driving Video Connections for Comcast Cable

By Shirley Pelts | Dec 30, 2015 6:10 am EDT

**X1 Platform drives subscriber growth in 3Q15**
Comcast Corporation's (CMCSA) X1 platform dominated 2015 for Comcast's cable communications business. But Comcast has made many changes to its X1 platform, including enhancing its sports app, the launch of a voice remote, and its Kids Zone.

At the UBS (UBS) Global Media and Communications Conference held on December 7, 2015, Comcast's Chief Financial Officer, Michael J. Cavanagh, stated that Comcast expects a strong fourth quarter when it comes to the company's video subscribers for its cable communications business.

The reason for this optimism in subscriber growth is because Comcast believes that it has a compelling product in X1. X1 is Comcast's VOD (video-on-demand) platform that offers search and personalised recommendations through Comcast's cloud computing infrastructure.

**Comcast's X1 VOD platform**
Comcast's X1 VOD platform has proved to be a success for the company in 3Q15. Comcast is in the process of deploying 40,000+ X1 set-top boxes a day. Comcast's cloud-enabled

Print

video X1 platform led almost 60% of connects for the video business in 3Q15. Around 25% of Comcast's Cable Communications video subscribers have opted for the X1 platform in 3Q15. Comcast added around 1 million X1 customers in 3Q15, including new customers and existing ones who upgraded to the X1 platform.

Comcast stated in its 3Q15 earnings call that "X1 customers have significantly lower voluntary churn, over 50% higher DVR penetration and take a greater number of advanced outlets." The low voluntary churn has resulted in higher X1 ARPU (average revenue per user) for Comcast.



Source: Comcast website

X1 in 2016
Comcast ended 3Q15 with X1 deployment penetration at 25% of Comcast's cable communications business video base. Comcast expects X1 deployment to come in at around roughly 30% penetration by the end of 2015 and to continue in 2016.

Comcast makes up 2.64% of the PowerShares QQQ ETF (QQQ). For an investor interested in getting exposure to the television and radio sector, QQQ has an approximately 4.4% exposure to the sector. QQQ also holds about 5.0% of Alphabet (GOOG) and 6.0% of Amazon (AMZN).

Keep reading for a look at how Comcast is using market segmentation to its advantage.

---

Comcast Expects Capex to Rise amid New Strategies and Competition PART 3 OF 14

# Why Is Comcast Offering Products Based on Market Segmentation?

By Shirley Pelts | Dec 30, 2015 6:47 am EDT

Comcast's market segmentation
Comcast Corporation (CMCSA) is offering different products in its triple-play services (voice, video, and high-speed Internet) based on market segmentation. For example, Comcast's

Internet Plus plan is for Millennials, or people in the 18–39 age group, who are not very interested in streaming videos but would like high-speed Internet.

Now let us look at the different products offered by Comcast for Millennials based on market segmentation.

Stream TV

Earlier this year, Comcast launched its live streaming video service, Stream TV, in Boston and Chicago. Comcast's Stream TV will be available only to Comcast's Xfinity Internet customers, and the plan's services available only in Boston and Chicago. Stream TV is priced at $15 per month.

However, Comcast's Stream TV service consumer will not be able to stream particular TV channels or access Xfinity on Demand programs when the user is not at home. It is because, for some content on Stream, Comcast's content providers have not given the company the right to stream their programs when users are away from home.

Another reason could also be that Stream TV is a streaming service that is viewed over Comcast's Xfinity Internet—Comcast's video, high-speed Internet, and voice service—and not over the Internet, like Netflix (NFLX).

Comcast has also stated that, as a result, "Stream TV data usage will not be counted towards your Xfinity Internet monthly data usage."

Comcast's Stream TV offers live sports, allows recording of a user's favourite TV shows and live sports events and also includes HBO (TWX). Stream TV seems to be targeted toward the Millennials, who tend to be heavy viewers of video at home.



Source: Comcast website

What is Watchable?

Watchable is Comcast's free, ad-supported video service that offers curated semi-professional content from around 30 content partners including BuzzFeed, Vox, and Maker Studios.

Xfinity on Campus

Earlier this year, Comcast also launched Xfinity on Campus, "a cable TV service that lets students watch live TV across screens."

Sure, but why market segmentation?

By offering different products among Comcast's triple-play services, Comcast is catering to Millennials, who want a different type of content and who tend to be heavy video viewers. Offering different products means Comcast can upgrade an existing customer instead of losing the customer to its competitors. It also suggests that market segmentation could result in the reduction of involuntary churn for Comcast, which could drive up the company's ARPU (average revenue per user) for its cable communications business.

Comcast makes up 0.44% of the iShares S&P US Preferred Stock Index Fund (PFF). For investors interested in getting exposure to the communications sector, PFF has exposure of 0.79% to that sector. PFF also holds 0.42% of its total portfolio in T-Mobile (TMUS).

Now let's look at what Comcast plans to roll out in 2016.

---

---

Comcast Expects Capex to Rise amid New Strategies and Competition PART 4 OF 14

# Comcast Plans to Roll out DOCSIS 3.1 Technology in 2016

By Shirley Pelts | Dec 30, 2015 1:16 pm EDT

Testing of DOCSIS 3.1 technology

On December 22, 2015, Comcast Corporation (CMCSA) announced that it had installed a modem that uses the DOCSIS 3.1 technology at a home in Philadelphia that could deliver speeds of 1 Gbps (gigabits per second) over Comcast's existing "hybrid fiber coaxial network." Comcast's planned deployment of this technology has been slated for early 2016.

Comcast has stated that the new DOCSIS 3.1 technology can work with the company's existing "Hybrid Fiber-Coaxial network," that is, it will be "backwards compatible." The company is also testing out the DOCSIS 3.1 technology at other locations in Pennsylvania, Northern California, and Atlanta.



Comcast has also been deploying its high-speed Gigabit Pro service. Earlier this year, Robert Howald, Comcast's vice president of Network Architecture, spoke about DOCSIS 3.1 with Fierce Cable. According to a report by Fierce Cable, the company's management said of DOCSIS 3.1 that it wants to get it across the footprint very quickly."

Comcast also gave a new estimate for DOCSIS 3.1's deployment, stating that it is "shooting for two years."

This deployment should significantly boost the positioning of Comcast in the US broadband space., Comcast had 22.9 million high-speed Internet subscribers in 3Q15.

### Comcast's Gigabit Pro
Comcast has already deployed an Internet product with even higher speeds in select areas. Its Gigabit Pro service offers speeds of a maximum of 2 Gbps. This service is available in certain parts of Atlanta, Chicago, Houston, and Miami, among other places. Comcast expects its Gigabit Pro service to reach 18 million households by the end of 2015.

Comcast is facing increasing competition for high-speed Internet. This competition is not only from telecom players such as AT&T's (T) U-verse service and Verizon Communications (VZ) FiOS service but also from a new entrant in the market, Alphabet's (GOOG) Google Fiber.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). For an investor interested in getting exposure to the television and radio sector, QQQ has 4.4% exposure to the sector.

Read on for a look at what Comcast has planned for usage-based pricing in 2016.

---

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 5 OF 14**

# Will Usage-Based Pricing for Comcast High-Speed Internet Continue in 2016?

By Shirley Pelts | Dec 30, 2015 1:28 pm EDT

### Usage-based pricing

Comcast (CMCSA) customers are making known their displeasure for usage-based pricing, that is, data caps. According to a December 29, 2015, ArsTechnica report citing a "Freedom of Information Act request with the FCC," there have been far more complaints—around 12,000 this year—for Comcast compared to AT&T (T), Verizon Communications (VZ), and Time Warner Cable (TWC).

Most of these complaints are against Comcast's 300 GB data caps that the company began imposing earlier this year. Comcast is imposing data caps in more cities across the United States while steadily trying out data caps in an increasing number of cities in the United States. Comcast stated in an earnings call in 2014 that it was planning to roll out data caps across all its markets in the United States over the next five years.

In 2015, Comcast started imposing overage fees for customers who exceed the 300 GB data limit. However, Comcast has stated that it will not impose data overage fees for a consumer exceeding the 300 GB data limit for the first three times the consumer goes over. For customers who want unlimited data, Comcast will charge them an additional $35 per month.

### High-speed Internet business in 3Q15

As the chart below indicates, Comcast's HSI (high-speed Internet) had 22.9 million customers in 3Q15. The net customer additions for HSI of 320,000 in 3Q15 was the strongest third-quarter result in the past six years for Comcast.



Comcast has stated that its revenues from high-speed Internet in 3Q15 grew by 10.2% year-over-year, mainly due to an increase in Comcast's residential high-speed Internet service

customers. The company's high-speed Internet customer base is growing as it gains more customers who want access to high-speed Internet.

Why the usage-based pricing?

At the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, Comcast stated that it believes that even if its revenues from high-speed Internet are growing steadily, it still believes that the high-speed Internet market has relatively low penetration.

Historically, Comcast has always priced its service based on speed, but it has started experimenting with usage-based pricing. The company is experimenting with usage-based pricing, as it believes that 10% of its high-speed Internet clients use 50% of Comcast's high-speed Internet network capacity. It views usage-based pricing as a way to "compensate" for the company's investments in technology to improve its HSI network.

However, considering the complaints from Comcast customers, it remains to be seen how long usage-based pricing continues.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector.

---

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 6 OF 14**

# Business Services Business: A Key Growth Driver for Comcast Cable

By Shirley Pelts | Dec 30, 2015 1:36 pm EDT

Business Services

At the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, Comcast (CMCSA) stated that it is optimistic about its Business Services business. Comcast said that it expects to penetrate deeper in 2016 into the business services market that caters to small and medium businesses. Comcast has already penetrated the business services market more than 10% regarding serving small businesses.

Comcast expects its market penetration to exceed 10% when it comes to business services that cater to a medium-size business. This is because it believes that it has a good product in its Ethernet network services, and its strong sales team will help it further penetrate the business services market.



Comcast's business services segment is moving toward annual revenues of $5 billion. Comcast now plans on targeting Fortune 1000 companies and large businesses with this segment.

Business Services in 3Q15

As the above chart indicates, excluding the residential triple-play services (video, HSI, and voice) Comcast's business services was the second-largest contributor to the growth of the Cable Communications business in 3Q15. Excluding triple-play services, Business Services has been the second-most important contributor to the growth of the Cable Communications business for 18 of the last 19 quarters for Comcast, indicating the growing importance of this business for Comcast.

This segment had revenues of $1.2 billion in 3Q15, an increase of 19.5% over the corresponding quarter last year. Around 70% of this revenue came from small businesses.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector. QQQ has 5.0% of its holdings in Alphabet (GOOG) and 6.1% in Amazon (AMZN).

Comcast Expects Capex to Rise amid New Strategies and Competition PART 7 OF 14

# Will Comcast Enter into the Wireless Network Space?

By Shirley Pelts | Dec 30, 2015 2:05 pm EDT

Comcast participating in the wireless auction

Comcast (CMCSA) stated at the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, that it intends to participate in the 600 Mhz (megahertz) wireless incentive auction of broadcast television spectrum in 2016.

Charter Communications (CHTR) has also stated that it is exploring participating in the auction. The 600 Mhz incentive broadcast television auctions will be held for the first time early next year by the FCC (Federal Communications Commission). This auction will consist of two parts: a forward auction and a reverse auction.



In the reverse auction, television broadcasters will give up their usage rights for the 600 Mhz spectrum. In the forward auction, mobile broadband providers will bid for flexible usage of wireless spectrum licenses.

However, Comcast's decision to sell "spectrum usage rights" for its NBCUniversal broadcast television network will depend on whether it gets a good price for giving up its spectrum.

### Comcast's deal with Verizon

Comcast is still not clear on whether it wil be entering the wireless network space shortly, but it does see value in becoming an MVNO (mobile virtual network operator) for companies such as Verizon Communications (VZ).

Comcast stated in its 3Q15 earnings call that it intends to renew a 2011 agreement between itself and Verizon that would allow it to resell Verizon's wireless service. In effect, Comcast will become an MVNO for Verizon. As an MVNO, Comcast would get access to Verizon's network services at wholesale rates and would be selling these services to its customers.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector.

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 8 OF 14**

# Key Growth Drivers of NBCUniversal Broadcast Television in 2016

By Shirley Pelts | Dec 30, 2015 7:02 am EDT

Retransmission fees growth

At the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, Comcast (CMCSA) stated that in 2016, it expects retransmission fees and affiliate fees to drive its revenues for its Broadcast Television segment.

Comcast had retransmission fee revenues of $4 million around five years back. It expects retransmission fee revenues of $400–$500 million by the end of 2015 and expects retransmission fees of $800 million in 2016.



Comcast expects the growth in retransmission fees in 2016 to be driven by significant events occurring in 2016 that would be covered by the company's television networks. These events include the Olympics in Rio and the US presidential elections.

There is a possibility that the coverage of these events by Comcast's television networks could also boost the company's advertising revenues. This is because, considering the increased viewership for these events, advertisers would be eager to pay for advertising time slots during the telecast of these events.

Comcast believes that there is still room to monetize its affiliate fee revenues fully. This is because Comcast has stated that there is a possibility of demanding higher affiliate fees from broadcast television stations, considering the strong viewership for Comcast's NBC group of channels and its "broad array of cable networks."

Case 1:15-cv-00616-RGA    Document 144    Filed 09/27/16    Page 59 of 72 PageID #: 4595

Broadcast Television's performance in 3Q15

Comcast's Broadcast Television business had revenues of $2 billion in 3Q15, an increase of
11.3% over 3Q14. As the above chart indicates, advertising revenues had a significant 60%
share of Comcast's Broadcast Television business, with revenues of $1.2 billion in 3Q15.
Content licensing revenues made up 27%, or $537 million, of total broadcasting television
revenues in 3Q15.

An increase in retransmission consent fees and a 33.5% growth in content licensing
revenues fueled revenue growth in 3Q15. This business had an OIBDA (operating income
before depreciation and amortization) of $150 million, an increase of 6.1% over 3Q14.

Comcast makes up only 0.96% of the iShares S&P 500 Growth ETF (IVW). IVW invests
2.7% of its holdings in Amazon (AMZN) and 4.8% in Microsoft (MSFT). IVW invests 3.0% of
its holdings in the entertainment sector.

---

Comcast Expects Capex to Rise amid New Strategies and Competition PART 9 OF 14

# Comcast NBCUniversal Theme Parks: A Core Growth Driver in 2016

By Shirley Pelts | Dec 30, 2015 10:03 am EDT

Harry Potter coming to Hollywood
On December 8, 2015, Comcast (CMCSA) announced that The Wizarding World of Harry
Potter would be coming to Hollywood in April next year. The Wizarding World of Harry Potter
will be declared open at Universal Studios Hollywood on April 7, 2016. Comcast expects that
this new attraction at Universal Studios Hollywood will result in an increase in visitors to the
park by around 2–3 million.

This is because The Wizarding World of Harry Potter has led to an increase in visitors to the
company's theme parks in Japan (EWJ) and Orlando. Comcast is also planning to launch a
King Kong attraction next year in Universal Florida and a water park at its Florida theme park
in 2017.



Comcast is planning multiyear growth in visitors at its theme parks by adding new attractions each year at the company's major theme parks around the world. Domestically, adding new attractions would give the company an edge over other companies' theme parks such as Six Flags (SIX) and Cedar Fair (FUN).

Comcast is also planning to add another 1,000 rooms to its Sapphire Falls hotel at its Universal Orlando theme park. This would result in around 5,000 rooms at the hotel.

Internationally, during 3Q15, Comcast acquired a 51% stake in Universal Studios Japan. Comcast is also planning to open a Universal theme park in Beijing, China (FXI) in 2020 or later.

### Theme Parks segment performance in 3Q15

Comcast's Theme Parks segment had revenues of $896 million in 3Q15, an increase of 14.1% over the corresponding quarter last year. Record attendance fueled revenue growth at Comcast's theme parks, including Orlando's Wizarding World of Harry Potter Diagon Alley and Fast and Furious: Supercharged.

The segment's OIBDA (operating income before depreciation and amortization) in 3Q15 was $458 million, an increase of 14.1% over the corresponding quarter last year. The higher revenues in the Theme Parks segment were offset by a rise in operating costs, including $18 million in transaction costs related to Comcast's plans to develop a theme park in China.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector. QQQ has 5.0% of its holdings in Alphabet (GOOG).

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 10 OF 14**

# Franchise Properties Drive Growth for Universal Pictures

By Shirley Pelts | Dec 30, 2015 10:46 am EDT

Filmed entertainment

On December 16, 2015, Comcast (CMCSA) announced that Universal Pictures had entered into a multiyear agreement with Amblin Partners. Amblin Partners is a new company formed by DreamWorks Studios, Participant Media, Reliance Entertainment, and Entertainment One. Under the terms of the agreement, Universal "will market and distribute films produced by Amblin Partners domestically and in select international territories."

The first movie under this agreement will be The Girl on the Train, which will be released in October 2016.



2015 has been the most successful year in history for Universal Pictures, as its movies Fast and Furious 7, Jurassic World, and the Minions have done business of $1 billion at the box office globally.

Comcast stated at the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, that it expects a weak 4Q15 for its Filmed Entertainment segment, as it has only a few theatrical releases scheduled for 4Q15, but it still expects to benefit as 3Q15 films move to home entertainment.

However, in 2016, Universal Pictures is going to continue its focus on its IP (intellectual or franchise properties) driving its movie releases and animated movies. One of the movies that Universal Pictures is going to release next year is an Illumination film, The Secret Life Of Pets.

Universal Pictures has made some strategic changes on the marketing and distribution side. Universal Pictures has decided not to have any representative of its movie distribution

business in China and is going to distribute movies in China "in-house." Comcast has also appointed Duncan Clark as Head of International Distribution, who will be solely responsible for the international distribution of films.

Filmed Entertainment business in 3Q15
Comcast's Filmed Entertainment business had outstanding success in 3Q15, with revenues of $1.9 billion, a rise of 64% over the corresponding quarter last year. The phenomenal growth in revenues was mainly driven by an increase in theatrical revenue from the stupendous success of Minions and Jurassic World. NBCUniversal's Universal Pictures was the first studio to have three of its movies make $1 billion worldwide in the same year.

As the chart above indicates, theatrical revenues were the primary contributor to the Filmed Entertainment segment's revenues at 46%. Theatrical revenues were $886 million in 3Q15.

The segment posted OIBDA (operating income before depreciation and amortization) of $376 million in 3Q15. 3Q15 was the second-most profitable quarter for Universal Pictures in the company's history.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector. QQQ has 5.0% of its holdings in Alphabet (GOOG) and 6.1% in Amazon (AMZN).

---

Comcast Expects Capex to Rise amid New Strategies and Competition PART 11 OF 14

# Comcast's Programming and Production Costs Fell 2% in 3Q15

By Shirley Pelts | Dec 30, 2015 12:30 pm EDT

Programming and production costs in 3Q15
Cable companies such as Comcast (CMCSA) and Time Warner Cable (TWC) have high content costs. These costs are similar to fixed costs incurred by media networks such as The Walt Disney Company (DIS) and Viacom (VIAB). However, as distributors, they have additional infrastructure investments compared to content providers and aggregators. Content costs account for a sizable portion of a cable company's operating costs.

Comcast's programming and production costs made up 38% of its total operating costs in 3Q15. Comcast had programming and production costs of $5.5 billion in 3Q15, a rise of 7.5% over 3Q14.



Source: Comcast SEC filings

Programming and production costs were the largest contributors to Comcast's total costs in 3Q15.

   According to Comcast, these programming costs are impacted by factors such as license fees for media content of cable networks and fees the company pays to broadcast television stations for retransmission of their content on the cable network.

As the above chart indicates, Comcast's programming and production costs fell by 2% in 3Q15 over its programming and production costs in 2Q15.

Will the fall continue?

At the UBS (UBS) Global Media and Communications Conference held on December 7, 2015, Comcast stated that it did not expect this trend to continue. It is because it expects retransmission costs to increase in 2016 as some of its retransmission fees contracts with MVPDs (multichannel video programming distributors) such as Dish Network (DISH) come up for renegotiation. Another factor that could contribute to the increase in programming and production costs in 2016 is increased expenditure on sports broadcast rights.

Production and programming costs could also increase in 2016 as Comcast tries to license its content broadly to different media companies.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). For someone interested in getting exposure to the television and radio sector, QQQ has 4.4% exposure to the sector.

Comcast Expects Capex to Rise amid New Strategies and Competition PART 12 OF 14

# Comcast Expects Capex to Rise in 2016

By Shirley Pelts | Dec 30, 2015 12:40 pm EDT

Increase in capex

According to a December 7, 2015, FierceCable report citing research by MoffettNathanson, with pay-TV companies either switching to or testing out DOCSIS 3.1 and the increased usage of smart televisions such as Apple (AAPL) TV, capex is expected to fall for pay-TV companies.

Because viewers watch video on their smart TVs by connecting their smart TVs directly to cable, the cost of rolling out CPE (customer premise equipment) such as set-top boxes is expected to reduce.



According to the Moffett report, "Comcast alone will see its CPE spending drop from $3.7 billion in 2015 to about $1.6 billion by 2019."

However, at the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, Comcast (CMCSA) stated that in 2016, it expects capex to be ~15% of its Cable Communications revenue in 2015. The rise will be mainly related to the rollout of CPE (customer premise equipment) including X1 and wireless gateways.

Comcast is also planning to increase its expenditure on cloud-based platforms and increase its focus on its Business Services segment.

For NBCUniversal, Comcast expects capex to remain relatively stable in 2015, with the majority of expenditure directed toward the company's Theme Parks segment. NBCUniversal is building new theme parks, including Harry Potter in Hollywood and King Kong in Orlando. NBCUniversal had capex of $289 million in 3Q15.

Capex in 3Q15

Comcast's capex in 3Q15 rose 11% over 3Q14 to $2.2 billion due to increased expenditure on the company's Cable Communications business. The Cable Communications business

had capex of $1.9 billion in 3Q15, a rise of 12.6% over the corresponding quarter last year. The capital expenditure at Comcast's Cable Communications business was 15.8% of the segment's total revenues of $11.7 billion in 3Q15.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). For an investor interested in getting exposure to the television and radio sector, QQQ has 4.4% exposure to the sector. QQQ also holds 6.1% of Amazon (AMZN).

---

Comcast Expects Capex to Rise amid New Strategies and Competition PART 13 OF 14

# How Will Comcast Fare against the AT&T-DirecTV Merger?

By Shirley Pelts | Dec 30, 2015 1:58 pm EDT

Impact on Comcast

Comcast (CMCSA) was asked about the impact of the AT&T (T) DirecTV merger on its triple-play (voice, video, and high-speed Internet) services at the UBS (UBS) Global Media & Communications Conference held on December 7, 2015.

Comcast stated that the AT&T-DirecTV merger has created a significant competitor in the cable market, as it would allow AT&T to offer "bundled wireless offering" along with its cable services. AT&T also offers the U-verse triple-play service.



Comcast stated at the UBS conference that the increased competition from the AT&T-DirecTV merger was one of the reasons for its increased focus on deployment of its X1 video platform, offering its triple-play products according to market segmentation. The merger is

Case 1:15-cv-00616-RGA   Document 144   Filed 09/27/16   Page 66 of 72 PageID #: 4602

also why it's trying out the new DOCSIS 3.1 technology for its high-speed Internet service before rolling out this technology early next year.

Comcast believes that these new initiatives will allow it to better face the increased competition from the AT&T-DirecTV merger.

AT&T-DirecTV merger
In July this year, AT&T acquired DirecTV for a transaction valued at ~$63 billion. At the completion of the merger transaction, the equity value of DirecTV was ~$47.1 billion, and its net debt was ~$15.9 billion.

In 3Q15, AT&T's U-verse had net losses of ~92,000 video subscribers. Meanwhile, the company added ~26,000 DirecTV video subscribers in its domestic segment. At the end of 3Q15, AT&T had ~25.4 million video subscribers in its domestic operations. This base comprised ~5.9 million U-verse video subscribers.

After its DirecTV acquisition, AT&T's pay-TV base became the largest in the United States. Note that before the acquisition, DirecTV had the second-largest US pay-TV base, and the largest in this metric was Comcast. A large subscriber base in this market gives AT&T better negotiating power for content costs.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector. QQQ has 5.0% of its holdings in Alphabet (GOOG).

---

**Comcast Expects Capex to Rise amid New Strategies and Competition PART 14 OF 14**

# How Does Comcast Prioritize Dividends and Share Buybacks?

By Shirley Pelts | Dec 30, 2015 12:59 pm EDT

Dividends and buybacks
At the UBS (UBS) Global Media & Communications Conference held on December 7, 2015, Comcast (CMCSA) was asked about its return of equity and how it prioritized dividends and buybacks.

Comcast is going to continue its share repurchases in 2015 and plans to buy back $6.8 billion worth of its stock. Share buybacks are a popular way for a company to return money to its shareholders, resulting in boosting the value of the stock that is still available.



On October 27, 2015, Comcast announced a dividend of $0.25 per share. The company stated in its 3Q15 earnings release, "During the third quarter of 2015, Comcast paid dividends totaling $623 million and repurchased 37.1 million of its common shares for $2.2 billion."

### Comcast's net leverage at a comfortable level

During 3Q15, Comcast acquired a 51% stake in Universal Studios Japan (EWJ). As a result, the company expects its net leverage to go up from 1.9x in 3Q15 to 2.0x by the end of 2015. Net leverage is the ratio of net debt to operating cash flow (or OCF).

Earlier this year, Comcast also invested around $200 million each in content-driven websites BuzzFeed and Vox in a bid to bring Millennial customers, or people in the 18–39 age group, back into the pay-TV fold.

Considering Comcast's comfortable net leverage ratio and its investments to grow its business, Comcast expects that it will be able to strike a fine balance between returning capital to its shareholders through dividends and buybacks and investing in its business growth.

Comcast makes up 2.6% of the PowerShares QQQ ETF (QQQ). QQQ has 4.4% exposure to the television and radio sector. QQQ has 5.0% of its holdings in Alphabet (GOOG) and 6.1% in Amazon (AMZN).

---

### The Realist Discussions

◈ 2013 Market Realist, Inc.

# EXHIBIT G



**Credit Suisse First Boston**
**2004 Media and Telecom Conference**
**December 7, 2004**

## Caution Concerning Forward-Looking Statements

This presentation contains forw ard-looking statements within the meaning of the Pri vate Securities Litigation Re form Act of 1995. In some cases , you can identify those so-called "forward-looking statements" by words such as "ma y," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential," or "continue," or the negative of those words and other comparable words. We wish to take advantage of the "safe harbor" provided for by the Private Securities Litigati on Reform A ct of 1995 an d we caution y ou that actual even ts or results may dif fer materially from the expectations we express in o ur forward-looking statements as a re sult of various risks an d uncertainties, many of which are bey ond our control. Factors th at co uld cau se our actu al re sults to differ materially fr om these forward looking sta tements, include: (1) changes in laws and regulati ons, (2) changes in the competitive environment, (3) changes in te chnology, (4) industr y consolidatio n and mergers, (5) franchise related matters, (6) market conditions that may adversely affect the availability of debt and equit y financing for working capital , capital expenditures or ot her purposes, (7) demand for the programming content we distribute or the willingness of other video program distributors to carry our content, (8) general economic conditions and (9) other risks described fro m time to time in reports and other documents we file with the Securities and Exchange Commission.

## Non-GAAP Financial Measures

Our pr esentation ma y a lso c ontain non- GAAP f inancial measures, as defi ned in Regulat ion G, adopted b y the SEC. We provide a reconciliation of these non-GA AP financial measures to the most directly comparable GAAP finan cial measure in our quarterly earnings releases, wh ich can be found on the investor relations page of our web site at www.cmcsa.com