1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4       TQ DELTA LLC,                :    CA NO. 16-611-RGA

5                    Plaintiff,      :    15-612-RGA,15-613-RGA

6                                    :    15-614-RGA,15-615-5GA

7              v.                         15-616-RGA

8                                    :

9       COMCAST CABLE COMMUNICATIONS :    October 11, 2016

10      LLC, et al.,                 :

11                                   :

12                   Defendants,     :    9:06 o'clock a.m.

13      ...........................:

14

15                   TRANSCRIPT OF DISCOVERY DISPUTE

16            BEFORE THE HONORABLE RICHARD G. ANDREWS

17                   UNITED STATES DISTRICT JUDGE

18

19

20      APPEARANCES:

21

22      For Plaintiff:      FARNAN LLP

23                          BY:  MICHAEL J. FARNAN, ESQ

24                               -and-

25                          MCANDREWS, HELD & MALLOY LLP

```
 1                          BY:  SCOTT P. MCBRIDE, ESQ

 2                          BY:  RAJENDRA A. CHIPLUNKAR, ESQ

 3

 4

 5    For Defendants:      MORRIS, NICHOLS, ARSHT & TUNNELL

 6                          BY:  JENNIFER YING, ESQ

 7                                  -and-

 8                          ORRICK HERRINGTON & SUTCLIFFE LLP

 9                          BY:  ALEX V. CHACHKES, ESQ

10                          Counsel for Defendant DirecTV

11

12                          MORRIS, NICHOLS, ARSHT & TUNNELL

13                          BY:  JENNIFER YING, ESQ

14                                  -and-

15                          DUANE MORRIS LLP

16                          BY:  COREY J. MANLEY, ESQ

17                          Counsel for or Comcast, Cox, Time Warner

18                          Cable & Verizon

19

20                          MORRIS, NICHOLS, ARSHT & TUNNELL

21                          BY:  RODGER D. SMITH, II, ESQ

22                                  -and-

23                          COOLEY LLP

24                          BY:  STEPHEN MCBRIDE, ESQ

25                          Counsel for Dish/Echostar
```

1                          ROSS ARONSTAM & MORITZ LLP

2                          BY:  BENJAMIN J. SCHLADWEILER, ESQ

3                                    -and-

4                          DUANE MORRIS LLP

5                          BY:  COREY J. MANLEY, ESQ

6                          Counsel for Verizon

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:          LEONARD A. DIBBS

25                              Official Court Reporter

1                    P R O C E E D I N G S

2

3              (The proceedings occurred at 9:06 o'clock a.m. as

4     follows:)

:05:52    5              THE COURT:  Good morning.  Please be seated.

6              This is <u>TQ Delta v. Comcast</u>, Civil Action No. 15-611,

7     plus some others.

8              Mr. Farnan, who's here with you?

9              MR. FARNAN:  Good morning, your Honor.

:06:06    10             Scott McBride and Raj Chiplunkar from McAndrews, Held &

11    Malloy out of Chicago.

12             MR. MCBRIDE:  Good morning.

13             THE COURT:  Good morning.

14             Mr. Smith.

15             MR. SMITH:  Good morning, your Honor.

16             Rodger Smith from Morris Nichols for Dish and Echostar.

17             With me today is Stephen McBride from Cooley.

18             THE COURT:  Ms. Ying.

19             MS. YING:  Good morning, your Honor.

20             Jennifer Ying from Morris, Nichols, Arsht & Tunnell on

21    behalf of Comcast, Cox, Time Warner Cable, and DirecTV.

22             I have with me Corey Manley from Duane Morris who

23    represents Comcast, Cox, Time Warner, as well as Verizon.

24             And then we have Alex Chachkes from Orrick in New York,

:06:42    25    who represents DirecTV.

1          THE COURT:  Mr. Schladweiler.

2          MR. SCHLADWEILER:  Good morning, your Honor.

3          Ben Schladweiler from Ross Aronstam on behalf of

4 Verizon along with Mr. McBride.

:06:50    5          THE COURT:  Okay.  All right.

6          So, I got these letters you sent in.

7          So, we don't have an unlimited amount of time here, and

8 I thought the one that came in that was from the defendants, it

9 was a lot easier to figure out, so let's instead do the one that

:07:10   10 comes in from the plaintiff, and we'll see if we can figure out

11 anything at all.

12          So, the first thing that's on plaintiff's list is

13 computer-generated financial reports for the accused products,

14 which apparently only involves Dish.

:07:24   15          And then I see Dish says, Exhibit E provides the

16 information that we want, so we don't even know why they're

17 arguing about this.

18          So, what's up here?

19          MR. SCOTT MCBRIDE:  Your Honor, the financial

:07:40   20 information provided by Dish and Echostar, where we had the

21 meet-and-confer, we were told that that information, the revenue

22 information, was not even tracked.  And, as of the letter, they

23 said everything had been produced, but the day before the

24 letter, they produced information, and then they continued to

:07:56   25 produce information after the letter.

1          It doesn't seem like the information is actually there.

2     And certainly with respect to Hopper and Joey, which are two of

3     the main products, the granularity that is requested is lacking.

4          THE COURT:  All right.

:08:12    5          I didn't understand too much of that.

6          Who wants to respond?

7          MR. STEPHEN MCBRIDE:  Your Honor, Steve McBride for

8     Dish.

9          So, we had produced -- we produced financial

:08:22   10     information over the course of the --

11          THE COURT:  Right.  I gathered the main complaint was

12     that it was not related in any particular way to the accused

13     products, whatever they might be.

14          MR. STEPHEN MCBRIDE:  So, I think we have produced

:08:34   15     information on the accused products for costs and revenues at

16     this point.  One document came in after the meet-and-confer.

17     This shows the revenues broken out by --

18          THE COURT:  Is this Exhibit E?

19          MR. STEPHEN MCBRIDE:  Yes, Exhibit E.  Broken out by

:08:48   20     Hopper and Joey.  And Hopper and Joey are the classes of the

21     accused products.

22          THE COURT:  All right.

23          What kind of granularity is this lacking, Mr. McBride?

24          MR. SCOTT MCBRIDE:  Yes, your Honor.

:09:02   25          Mr. Chiplunkar will respond.

1      MR. CHIPLUNKAR:  The accused products, there are about,

2  I want to say, ten or twelve accused products.  This is broken

3  down by just Hopper and Joey.

4      But there's a Hopper 1, there's a Hopper 2, there's a

:09:14      5  Hopper 3.  Some products read on all of the patent claims, and

6  some of them relate only to maybe one of the patent families.

7      So, for damages purpose, we need more granularity so

8  that we can apportion them.

9      THE COURT:  So, this is the kind of information you

:09:30      10  need.  Your complaint is that instead have just having a Hopper

11  column and a Joey column, there ought to be ten columns with

12  smaller numbers in each?

13      MR. CHIPLUNKAR:  Yes.

14      THE COURT:  Mr. McBride?

:09:40      15  MR. STEPHEN MCBRIDE:  We can certainly go back and look

16  for more granularity on this.

17      THE COURT:  Well, I would imagine, although, I don't

18  know for sure, that if you can do a Hopper column and a Joey

19  column, you can probably do a Hopper 1, and a Hopper 2, and a

:09:52      20  Hopper 3, don't you think?

21      MR. STEPHEN MCBRIDE:  I would think so.

22      THE COURT:  Okay.

23      MR. STEPHEN MCBRIDE:  We've had some difficulty

24  breaking this information out.

:10:00      25      THE COURT:  All right.

1         If they get you that, does that then satisfy this one?

2         MR. SCOTT MCBRIDE:  Yes, I believe so, your Honor.

3         THE COURT:  Okay.

4         Mr. McBride, for the defendants, do you think for Dish,

:10:14   5   I guess?

6         MR. STEPHEN MCBRIDE:  This would only be Dish, your

7   Honor.

8         THE COURT:  Dish.

9         When can you get this information?

:10:24   10   MR. STEPHEN MCBRIDE:  Well, like I'm saying, your

11  Honor, it's been very difficult for our client to get this

12  information.  To the extent we have it, I think we can probably

13  get it within three weeks or so.

14        THE COURT:  Okay.  So, three weeks.  Today is October

:10:36   15  11th, so let's say November 1st, because that seems to be a date

16  that was in there somewhere.

17        So, try hard to get your client to produce this.  If

18  you can't produce it by November 1st, because your client

19  actually swears it cannot be done, make sure your client

:10:52   20  actually produces a Declaration to that effect --

21        MR. STEPHEN MCBRIDE:  Yes, your Honor.

22        THE COURT:  -- okay?

23        All right.

24        So, the next things on the list here are the

:11:04   25  Interrogatories No. 3 and 4 seem to go together.

1           And it seems to me that the general gist of the

2     responses to plaintiff's request here are that your contentions

3     are poor, so don't expect a whole lot from the defendants.

4           Is that the general flavor of what we've got here?

:11:28          5           MR. CHACHKES:  With some additional footnotes, but,

6     yes, your Honor.

7           THE COURT:  All right.

8           Mr. McBride, or Mr. Chiplunkar, what do you have to say

9     about this?

:11:36         10           MR. CHIPLUNKAR:  So, with respect to 3, these

11     infringement contentions that are fairly detailed, some of them

12     are up to 60 or 70 pages.

13           THE COURT:  Well, sometimes the length of pages doesn't

14     necessarily actually mean much.

:11:50         15           MR. CHIPLUNKAR:  But with the sections, the important

16     sections highlighted, that's exactly the point of why we believe

17     that the products infringe the claims.

18           THE COURT:  And, so, one of their complaints is, you

19     don't actually do it on the products, you do it on the

:12:04         20     standards?

21           MR. CHIPLUNKAR:  Yes.

22           THE COURT:  Is that right?

23           MR. CHIPLUNKAR:  We have cited to the standards, that's

24     right, your Honor.

:12:12         25           THE COURT:  So, in terms of their hundreds of products,

1    or however many -- I thought I saw that number somewhere, but I

2    could be wrong -- there are no infringement contentions

3    identifying how their particular products read on the claims,

4    right?

:12:32    5    MR. CHIPLUNKAR:  The information is still coming in.

6    We're getting test results from the defendants that actually say

7    that the product practices this portion of the standards.  And

8    we will update our infringement contentions to exact -- to cite

9    to those test results, when we have a complete set of test

:12:48    10   results for each of the accused product.

11   THE COURT:  But right now you don't really have --

12   haven't made contentions for any of the products that are

13   actually products specific, right?

14   MR. CHIPLUNKAR:  We have.  Our other pleading cover

:13:02    15   sheet identifies every product, and sets forth which products

16   infringe which family of patents.  And then because they say

17   that the products comply with MoCA 1 -- 1.0, for example, by

18   virtue of them complying it with MoCA 1.0, for example, they

19   practice the standard, and that's how our infringement

:13:22    20   contentions are set forth today.

21   THE COURT:  All right.

22   Do you ever, in this case, expect to have any

23   infringement theories that are beyond your product says it

24   practices this standard, and this standard reads on the -- on

:13:34    25   the patents cover the same thing as the standard?

1          MR. CHIPLUNKAR:  Yes, we will supplement.  We will

2     point to -- as of now, based on the information that we received

3     from the defendants, and we're getting additional information

4     from the box makers, we intend to -- we plan to update our

:13:54    5     infringement contentions to point to the test results on a

6     product-by-product basis and say, for example, the Joey passes

7     test one, which you know, test one maps to that particular

8     portion of the standard, so we will do it on a product-by-

9     product basis.

:14:10   10          THE COURT:  Okay.

11          So, I think the case is that on whether or not the

12     asserted claims read on the accused products, that they're

13     right.  Until you have contentions that the products identified

14     -- you've got to go first on this.

:14:32   15          And, so, from what you're telling me, you really

16     haven't done that yet.

17          So, I think the main issue here is more the second one,

18     Interrogatory No. 4, which is whether the asserted claims read

19     on the MoCA standard, which is what I understand you have done

:14:46   20     already in your contentions, right?

21          MR. CHIPLUNKAR:  Yes.

22          THE COURT:  All right.

23          Who is addressing this for the defendants?

24          MR. MANLEY:  Your Honor, Corey Manley.

:14:58   25          And you're correct, this does overlap with No. 3, so

1    Mr. Chachkes may have something to contribute as well.

2              But, really, the main issue here is, is you're right.

3    The only relevance of the information being sought in

4    Interrogatory No. 4, which is whether the asserted claims read

:15:16     5    on the MoCA standard is -- goes to infringement in the case.

6              And defendants, in response to Interrogatory No. 3,

7    have provided a list of numerous reasons why the standard is not

8    practiced by the claims.

9              So, we believe that although those -- that information

:15:38     10   isn't set forth in Interrogatory No. 4, it incorporates by

11   reference a response to Interrogatory No. 3, and Interrogatory

12   No. 3 does contain this information.

13             THE COURT:  So it's not -- so what you're saying is,

14   your response as to No. 3, provide the information that's

:15:58     15   requested by No. 4?

16             MR. MANLEY:  Correct.  And Interrogatory No. 4 is

17   really just a subset of the information sought by Interrogatory

18   No. 3, and we've provided that in response to Interrogatory 3.

19             THE COURT:  All right.

:16:12     20        What do you have to say about that?

21             MR. SCOTT MCBRIDE:  Well, Interrogatory 4 and

22   Interrogatory 3 do seek different information.

23             Interrogatory 4 seeks a comparison of the asserted

24   claims with the MoCA standard.  They are refusing to provide

:16:26     25   that information.

1             THE COURT:  I think he just said that they provided

2 that in Interrogatory No. 3.

3             Did I misunderstand what you said, Mr. Manley?

4             MR. MANLEY:  No, that's exactly right.  We have

:16:34   5 provided it.  We've identified specific claim limitations that

6 we believe are not practiced by the standard.

7             And we found that for each patent and we have provided

8 that information.

9             THE COURT:  What do you have to say about that?

:16:48   10             MR. SCOTT MCBRIDE:  What they don't say is, they don't

11 say, okay, these products read on the standard, and then they

12 lack these elements, because the claims don't cover the

13 standard.

14             That is what is being sought in Interrogatory 4 is, do

:17:00   15 the claims read on the standard or not?

16             And with respect to Interrogatory No. 3, they don't

17 cite the documents, they just have a litany or a list of claim

18 elements.

19             THE COURT:  Okay.  So, let's just try to do this in

:17:12   20 small pieces.

21             In response to Interrogatory No. 3, they provide their

22 positions on whether or not the asserted claims read on the

23 standards, but they don't provide any backup for that?

24             MR. MCBRIDE:  I don't think they say whether or not the

:17:34   25 claims read on the standard on 3.  I think they say whether or

1    not the claims read on the products in Interrogatory No. 3.

2         So, I don't think what they're saying is a hundred

3    percent correct.

4         THE COURT:  Hold on a minute.

:18:14    5         So I'm pointing to Exhibit G with a lot of bullet

6    pointed things in response to Interrogatory No. 3, and lots of

7    things in quotations, which I assume are part of the patents?

8         MR. MANLEY:  Those would be specific claim limitations

9    that are being identified that are not practiced by the standard

:18:36    10   or the products.

11        THE COURT:  All right.

12        So, one of the sentences here -- and maybe it's the way

13   they're written -- actually, I have response to Interrogatory

14   No. 3 in front of me, which is four, five -- about five pages

:18:58    15   long.

16        At least part of it does seem to me maybe that if what

17   you're saying is, it doesn't meet the standards -- actually, let

18   me go back just a second.

19        Mr. Manley, I take it that plaintiffs have provided

:19:28    20   contentions -- and, you know, I don't want to argue about the

21   details -- but they have provided contentions that provide some

22   information as to why they think the patent claims read on the

23   standards, right?

24        MR. MANLEY:  That's correct.

:19:46    25        THE COURT:  And, so, you acknowledge that you should be

1    providing some information as to why, and you -- where you

2    disagree with that, right?

3              MR. MANLEY:  Correct.  And we believe we have.

4              THE COURT:  Okay.

:20:02   5    And, so -- and in the five pages, it appears to me that

6    there's -- can you explain to me that there's -- can you explain

7    to me, or show me in these five pages where it says that where

8    you, the defendants, are explaining what your contentions are,

9    as to why the patents and the standards are not coextensive?

:20:46  10              MR. MANLEY:  Sure.

11              So, because their infringement contentions read

12    exclusively on the standard, we have identified in response to

13    Interrogatory No. 3, which these our are disagreements with

14    their infringement contentions, the specific claim limitations

:21:04  15    for the patents which do not believe are practiced.

16              THE COURT:  Right.  There seem to be a lot of them.

17              MR. MANLEY:  Correct.  We think there are a lot of

18    issues there.

19              And we listed the specific limitations, and it is clear

:21:18  20    from those limitations, and what is in our claim construction

21    briefing, what the issues and arguments are there.  We don't

22    think there is any confusion there.

23              THE COURT:  So, the claim construction briefing is

24    something else.

:21:34  25              It's not a response to an interrogatory, right?

1          MR. MANLEY:  That's correct.

2          THE COURT:  Let's put that aside.

3          Just based on the interrogatory, what's clear here?

4          MR. MANLEY:  So, the interrogatory identifies the

:21:52    5   specific limitations that we believe are not practiced.

6          THE COURT:  Right.

7          How does that relate to the standard?

8          MR. MANLEY:  Because the claim limitations are not

9   practiced by the standard, because that's the only thing they

:22:06   10   cite to this in their infringement contentions.

11          THE COURT:  Okay.  So -- all right.

12          So, I understand what you're saying, which is, it

13   doesn't seem to be perhaps explicitly set forth here.

14          MR. MANLEY:  Yes, I think the confusing part is

:22:22   15   Interrogatory No. 3 goes to their infringement -- well, how we

16   disagree with their infringement contentions.

17          And Interrogatory 4 goes to whether the standard reads

18   on the claims.

19          And they're coextensive really because their

:22:38   20   infringement contentions are, you infringement because of the

21   standard, and they cite only to the standard.

22          THE COURT:  All right.

23          So what you're saying, for example, is on Page 4 when

24   you say the accused products in relation to the '404 patent, do

:22:54   25   not enter quote, "low power mode," unquote.

1        You're saying the standard dose not require a low power

2   mode?

3        MR. MANLEY:  Both, yes.  The standard doesn't require

4   it, and as a result, the products don't do it either.

:23:14    5        THE COURT:  All right.

6        I believe it's the case -- let's assume for the minute

7   that that is essentially something that one could, you know,

8   essentially amend the response to say, this is what we mean, or

9   -- and I do see this incorporated by reference in Interrogatory

:23:36   10  No. 4 -- but it does seem to me, just looking at it, less than

11  clear that it's doing what you're saying it's doing.

12       Let's assume for a minute they did that.

13       What else is it that you are asking for here that you

14  are unsatisfied by?

:23:50   15       MR. MCBRIDE:  The bases for that argument, the

16  citations to document, since -- okay, we don't think it requires

17  us to do that, or what does it require instead, or what -- how

18  does the product operate?

19       THE COURT:  Because we're talking about the standards

:24:08   20  here, let's try to word it in that.  You've got a claim that

21  says "low power mode."  Presumably, the implication here is the

22  standard doesn't require a low power mode.

23       And what else is it do you expect from them on that?

24       MR. SCOTT MCBRIDE:  Citations to a document and an

:24:30   25  explanation as to why, why they contend that.

I think with respect to Interrogatory No. 3, does the claim -- essentially does the claim read on the accused product, and in Interrogatory No. 4, is the claim standard essential?

Well, what they said is, okay, we're supposed to decipher between their two responses, but we can't determine what are they saying.

Does the claim not read on the product because the product doesn't comply with the standard, or because the claims are not standard essential?

MR. CHACHKES:  If I may, your Honor?

THE COURT:  Sure, Mr. Chachkes.

MR. CHACHKES:  The plaintiffs haven't even tied the product to the standard, so their contention just says, these are MoCA-compliant products.  No document cites.

Our -- I'm just going to speak for DTV at this moment, but I'm sure the other defendants have similar issues -- our product don't say, MoCA-compliant on them.  They have MoCA chips in them.  And we dug and it turns out that some of these functionalities don't exist in the chips, and a lot of the standard is optional.

So, until the plaintiffs tie the actual products to the standard, it's even difficult at that point to say, here's why you're wrong about the standard, because they haven't even made that case yet.

THE COURT:  Right.  So, part of what I think is going

1    on, but I could be wrong is, while the two are related, they are

2    not necessarily.  They don't have to be completely

3    interdependent.

4            But you said one thing that caught my attention.

:26:06   5            Do we have here the plaintiff's contentions that are

6    essentially at issue here?

7            MR. MANLEY:  I believe an exemplary example is Exhibit

8    F.

9            THE COURT:  Right.  I think I looked at this briefly.

:26:52  10            (Pause)

11            So, I'm looking at plaintiffs, I guess Exhibit F, claim

12    chart 3, that starts off in multi-carrier modulation system, and

13    then there is more.

14            And there are pages -- I'm looking at Page 9, which

:27:20  15    starts off at the top 4.2.1.1, transmitter reference model.

16            What's the 4.2.1.1 referring to?

17            MR. MCBRIDE:  That's a portion of the standard.

18            THE COURT:  Okay.  All right.

19            Well, so, I can't tell from this -- and I'm not going

:27:46  20    to be able to tell in the next few minutes -- but it seems to me

21    that as a general principle, which my colleagues have often

22    cited, that the defendants' responses ought to be essentially

23    proportional to whatever the plaintiff's contentions are.

24            I'm not going to figure that out right now, so I'm just

:28:14  25    going to say that as a general principle -- and I don't really

1       know how it plays out -- we'll figure out what to do about that

2       in a minute, or before you leave here today.

3              But, so, let's -- having said that, you know, I do

4       think based on what's said that the interrogatory, it talks

:28:38        5       about whether the asserted claims read on the accused products.

6              I don't think the standard is met there.  I can't tell

7       whether it's met as to whether the asserted claims read on the

8       MoCA standard.

9              I tend to think that plaintiffs have certainly done

:28:52        10      something in that regard, and, so, there is some response due,

11      but in terms of whether the response is sufficient, I can't

12      tell.

13             All right.

14             Let's go on to Interrogatory No. 6, which I believe is

:29:06        15      actually the last of plaintiffs.

16             And this has to do with, I think just Dish, right?

17             MR. STEPHEN MCBRIDE:  That's correct.

18             THE COURT:  You're the Dish man, Mr. McBride, right?

19             And, so, one of the things that they say is, I've

:29:22        20      already ordered this for four of the six defendants, and the

21      fifth one, DirecTV, one could infer I saw the handwriting on the

22      wall, so they went along with it without being ordered.

23             And, so, what is Dish's -- I forget.  I saw that Dish

24      had some response, but I'm forgetting what it is right now.

:29:48        25      MR. STEPHEN MCBRIDE:  Right, your Honor.

1          I think we're happy to supplement this.

2          THE COURT:  All right.

3          When are you going to do that by?

4          MR. STEPHEN MCBRIDE:  November 1st is fine.

:30:00    5          THE COURT:  All right.

6          And when you say you're going to supplement the

7    response, tell me what kind of information you're going to

8    actually provide.

9          MR. STEPHEN MCBRIDE:  So, we've agreed to provide an

:30:10   10   identification of individuals, and their response to the

11   request.

12         We've agreed to provide citations to do with additional

13   documents, many of which have been produced since the responding

14   question, and to provide more of a narrative about what the

:30:30   15   benefits associated with the MoCA products are.

16         THE COURT:  So, one of the things that I remember

17   vaguely, either from reading the letter or from memory, there

18   was talk about what I guess would be called something other than

19   direct monetary benefits.  And I think there's a reference in

:30:52   20   here to me ordering some sort of search for something that would

21   involve non-monetary benefits.

22         Actually, you know what I'm talking about, right?

23         MR. SCOTT MCBRIDE:  Yes, your Honor.

24         THE COURT:  Why don't you state for the other Mr.

:31:14   25   McBride what it is that you think I ordered before?

1        And I just want to see if they're going to be looking

2    for this, too.

3        MR. SCOTT MCBRIDE:  So, the non-monetary benefits would

4    include benefits associated with customer retention, offering a

:31:30      5    feature that the customers want or need.

6        THE COURT:  And I forget, was this sort of limited to

7    market surveys, or that kind of thing, or was it just any stray

8    e-mail where, you know, some executive says, gee, this is a good

9    thing?

:31:48     10        MR. SCOTT MCBRIDE:  That's a good question, your Honor.

11        The e-mail production is slightly separate and the

12    parties are working through identification issues, but with

13    respect to -- with respect to document production, I believe it

14    was with respect to documents that discussed the benefits of

:32:02     15    MoCA, so that would include benefits associated with MoCA,

16    including whole home DVR and the benefits that that provides.

17        THE COURT:  All right.

18        And, so, Mr McBride, what the other Mr. McBride just

19    said, I'm -- it sort of generally strikes me as probably being a

:32:24     20    fairly accurate statement.

21        I think it came before in the context of, there was

22    talk about why did the defendants sort of get into MoCA line of

23    products.

24        And, so, I think that's the kind of document.  I

:32:52     25    remember some of the defendants said that that took place a long

1    time ago.

2              MR. STEPHEN MCBRIDE:  Yes.

3              THE COURT:  But something where management is figuring

4    out, you know, is this a good product to have or not, that sort

:33:06    5    of thing, right?

6              MR. MCBRIDE:  Yes, your Honor.

7              THE COURT:  If you could include that in what you're

8    looking for.

9              And, otherwise, are you satisfied with the promise that

:33:22    10    they will supplement?

11             MR. SCOTT MCBRIDE:  Yes, your Honor.

12             One of the concerns was that they have already

13    identified 8700 plus pages.

14             THE COURT:  Well, I think Mr. McBride said that they

:33:34    15    were actually going to call out some specific references as to

16    things that were actually relevant to this topic?

17             MR. STEPHEN MCBRIDE:  That's right, your Honor.

18             At the time we had not.

19             MR. SCOTT MCBRIDE:  That sounds adequate to me.  You

:33:46    20    know, as to documents relating to X, look at this range, et

21    cetera.  Things like that would be quite helpful.

22             THE COURT:  All right.

23             So, do you think you can do this by November 1st?

24             MR. STEPHEN MCBRIDE:  Yes, your Honor.  I think we can.

:33:58    25             THE COURT:  All right.

1          Other than the big thing that I've punted on, have I

2     address basically the concerns that are in your letter?

3          MR. CHIPLUNKAR:  Yes, your Honor.

4          MR. SCOTT MCBRIDE:  I believe so, your Honor.

:34:18    5     THE COURT:  Okay.

6          So, in the other letter -- so here's what I thought.

7          There seems to be some back and forth about whether or

8     not plaintiff had to do anything before it had all the

9     information at hand.  And there was a citation to 02 Micro

:34:46   10   International v. Monolithic Power Systems, 467 F.3d 1355,

11    Federal Circuit 2006.

12         And it was talking about the local patent rules in the

13    Northern District of California, but it said, sort of addressing

14    the issues that you've raised, that those rules, quote, "are

:35:04   15   designed to address this problem by requiring both the plaintiff

16    and the defendant in patent cases to provide early notice of

17    their infringement invalidity contentions and proceed with

18    diligence in amending those contentions when new information

19    comes to light in the course of discovery," close quote.

:35:22   20   And I sort of get the sense that that's where we're at

21    with -- I thought with the common Interrogatories 9 and 10.

22         Hold on a minute.

23         And, so, plaintiffs, they say that you basically have

24    not responded to this interrogatory relating to substance, No.

:36:18   25   9, is that right?

1        MR. SCOTT MCBRIDE:  And we've agreed to -- and we've

2  stated it's premature at this time -- in light of the fact that

3  there hasn't been a claim construction -- but also --

4        THE COURT:  Well so, that doesn't make it premature,

:36:34    5  because actually one of the reasons why you do claim

6  construction is it helps to flesh out what your points of

7  dispute are.

8        And, so, that's the reason why, I think, you need to do

9  something.  I understand claim construction is imminent, so it

:36:48   10  may not actually help with that.  Maybe it will make some points

11  moot, so I guess that would be a help.

12        But you can't say, we're not doing an infringement

13  contention until after we get claim constructions.  If you have

14  a particular -- you know, and when I end up construing things

:37:06   15  the way you didn't expect, that's when you perhaps change your

16  infringement contentions or vice-versa, or invalidity

17  contentions.

18        But it's not good enough to just say, no, we're waiting

19  to see how the judge construes these things.

:37:22   20        MR. SCOTT MCBRIDE:  There are more reasons as well,

21  your Honor.

22        The contentions, themselves, don't have -- and this may

23  speak to your issue of proportionality -- don't have any level

24  of detail with respect to obviousness, or how references should

:37:34   25  be combined, or things of that nature.

1    So, if we're talking about just saying, okay, which --

2    and also we have a situation where I believe your Honor had

3    ordered, and the parties have been trying to negotiate, but have

4    been unsuccessful so far in reducing the number of prior art

5    references per claim.  We already have four in place with

6    respect to the reduction of asserted claims, and the parties

7    have been following that.

8    But that's something else that is making this more

9    burdensome than it should be.

10   But if the answer is to say, okay, with respect to the

11   references they've identified, and proportionally you can

12   identify which references don't include which limitations,

13   that's something that the plaintiff can do.

14   If you are talking about something beyond --

15   disproportional to what has been provided, it's not appropriate

16   at this time.

17   THE COURT:  All right.

18   Well, who's speaking for this on the defendants side?

19   MR. CHACHKES:  I am, your Honor.

20   THE COURT:  Yes, Mr. Chachkes.

21   MR. CHACHKES:  So, that part I think we're basically on

22   the same page, so we have extensive invalidity contentions.

23   Here's the prior art.  Here's the claim limitation.  Here in the

24   prior art is that claim limitation.

25   So, one thing we are looking for, and I think it sounds

1    like that's what we'll be provided is, tell us if you disagree.

2         If we say, claim limitation, you know, first is in this

3    prior art, it tell us if you disagree.

4         So that is most of what we're looking for.

:39:04    5    We do set out a non -- an obviousness case which

6    requires the combining of different references.  If plaintiff

7    disagrees with us as to these two references can be combined for

8    the following reasons, which is set our in our invalidity

9    contentions, we would like to know that as well.

:39:26   10    THE COURT:  To the extent they say, this limitation

11   appears in this reference, you know, that's a target.

12        Either you agree or you disagree, right?

13        MR. MCBRIDE:  Yes, your Honor.  And certainly expert

14   testimony later in the case may help flesh that out, but, yes.

:39:50   15    THE COURT:  Right.  But for various reasons we're not

16   waiting for expert testimony to find out what you think the case

17   is.

18        You know, I'm a little hazier on the obviousness,

19   because, you know, if they say, here's reference A and here's

:40:10   20   reference B, and there's a motivation to combine these, you

21   know, I think that is getting the things pretty much core expert

22   sort of testimony, and, so, I can understand why it's harder to

23   respond to that.

24        In terms of whether limitations appear in prior art

:40:36   25   that they are citing, I think you need to respond on the merits,

1       all right?

2                MR. SCOTT MCBRIDE:  Yes, your Honor.

3                THE COURT:  So when can you do that by?

4                MR. SCOTT MCBRIDE:  November 15th, your Honor.

:40:52   5                THE COURT:  All right.

6                MR. STEPHEN MCBRIDE:  And, your Honor, one additional

7       aspect is the fact of the art being prior art, so the date we've

8       identified would be great if we could get the response to that

9       as well, whether it's actually prior art.  That's something

:41:16  10      we've established in our invalidity contentions.  It's a fact

11      and not something that is subject to expert testimony.

12               THE COURT:  Well, it may or may not be.

13               In any event, I think it's something that is certainly

14      -- it is a factual question, whether or not something is or is

:41:34  15      not prior art.  And most of the time those issues get resolved,

16      because issues are pretty obvious it either is or it isn't.

17               So, to the extent that that is in there, that does seem

18      like something that there could be -- you know, without knowing

19      exactly how you said it, but if you say the priority art date

:42:00  20      is, you know, June 1, 2000, it seems like something that you

21      ought to be able to say, yes, we agree or, no, we don't.  We

22      think the priority date is X, or we don't agree with that date,

23      but we agree it's prior art.

24               MR. CHACHKES:  Or that it's public enough.  There is

:42:20  25      certain prior art --

```
  1                THE COURT:  Whatever it is you've alleged.

  2                You know, but that that does -- that is something that

  3      again, that is a thing that can be addressed now.  We don't have

  4      to wait until the end of case to address it.

  5                MR. SCOTT MCBRIDE:  Yes, your Honor.

  6                THE COURT:  Okay.

  7                So, that's November 15th.

  8                On the secondary consideration of non-obviousness, if

  9      you are busy asserting that these things exist, you need to say

 10      what you have right now that you think supports those

 11      assertions.

 12                MR. SCOTT MCBRIDE:  Understood, your Honor.

 13                THE COURT:  So, November 15th for that, too?

 14                MR. SCOTT MCBRIDE:  Yes, your Honor, with the

 15      understanding that some of the information is not yet available

 16      to dig it up, and actually we would expect to supplement

 17      information -- additional information as that becomes available

 18      as well.

 19                THE COURT:  Yeah, I mean all of this is pretty much

 20      without prejudice to supplementation as you get additional

 21      information.

 22                All right.

 23                So, Common Interrogatory No. 11.  I had the impression

 24      that was moot, because the defendants say they provided all the

 25      marking information they have.  There is no more.
```

1    MR. SCOTT MCBRIDE:  That's correct, your Honor.  That's

2 definitely plaintiff's position.

3    THE COURT:  That it's moot?

4    MR. SCOTT MCBRIDE:  Yes, your Honor.

:43:38  5    THE COURT:  Oh, I'm sorry.  I'm getting reversed.

6    Who's asking for what?

7    You provided all the information?

8    Okay.

9    Isn't it moot?

:43:48  10    MR. CHACHKES:  No, your Honor.

11    So, the patents used to belong to a company called

12 Aware.  Aware licensed them.  Products were made were made under

13 those licenses.  Those products were not marked.  Those products

14 were DSL products.  TQ Delta has alleged that DSL infringes

:44:06  15 those patents as well, so there's a marketing defense.

16    What -- we got in response -- so marking is also the

17 plaintiff's burden.  This is something they affirmatively have

18 to state.

19    THE COURT:  Right.  But, I mean, so they say, we

:44:20  20 provided everything we have on this.

21    MR. CHACHKES:  They haven't provided their contentions.

22 They provided their discovery, and we have discovery from Aware

23 as well, but they haven't told us.

24    So they cited 33D and they said, look at those

:44:34  25 licenses.

1          Now, when we read their interrogatory, our conclusion

2     is, you can't make the marking defense, because you have no --

3     nothing to support it.

4          If plaintiffs agree, they can tell us that in their

:44:48     5     contentions.

6          If they disagree, what we're go seeking to avoid is a

7     month from now, or weeks before discovery ends, some new

8     argument why they think they've satisfied their marking

9     requirements that we didn't anticipate, because they didn't

:45:04    10     answer their interrogatory.

11          We literally have nothing from them on that

12     interrogatory whether they think marking is applicable, where

13     they think it breaks down, if it does break down, and whether

14     they've satisfied it.

:45:18    15          THE COURT:  Okay.  You know, one of the disadvantages

16     sometimes of having a fairly limited written submission is you

17     miss a word here and there.

18          Then you say, they should be required to either drop

19     the claim or articulate its contention.

:45:34    20          Whereas, I was thinking it to be more of a production

21     of factual information.

22          So, I also recall -- well, never mind.

23          Do you have a contention that these products have been

24     marked?

:45:50    25          MR. SCOTT MCBRIDE:  I think, without additional

1   information, I'm not sure we can provide that for all the

2   patents, your Honor.

3            THE COURT:  All right.

4            Well, so, I think it's completely fair that you be

:46:06   5   required to make your contentions as to which products have been

6   marked for which patents, and say what it is you're relying

7   upon, because this seems like the sort of information that it

8   ought actually to be already known to you.  It doesn't require

9   expert testimony.

:46:30   10           And it would certainly, I would imagine, help everybody

11  understand where they are in terms of damages, which is that

12  marking is an issue, or is not an issue, all right?

13           So, can you put forth your contentions on that?

14           I understand the factually you have no further

:46:52   15  information, but do you think you can put your contentions forth

16  on that by November 15th?

17           MR. SCOTT MCBRIDE:  Yes, your Honor.

18           THE COURT:  All right.

19           Common Interrogatory No. 12.

:47:04   20           Oh, this is the one that wants everybody in the history

21  of the world who knows anything about the prosecution histories

22  of these.

23           I'm sorry.  I think given over the prosecution file is

24  sufficient, so I'm just going to deny that request.

:47:20   25           MR. CHACHKES:  And I think it does also ask for the

1    people at TQ Delta who wrote claims who were involved in the

2    prosecution.

3         THE COURT:  Yeah, see, I don't understand what that has

4    to do with anything.

:47:32    5         MR. CHACHKES:  I won't belabor the point.

6         THE COURT:  Okay.  All right.

7         So, then the last -- or not actually -- the next to the

8    last thing is value and valuation documents.

9         And, you know, I know we've discuss this before, have

:47:50    10   we not?

11        MR. SCOTT MCBRIDE:  We have.  I believe we have, your

12   Honor.

13        THE COURT:  So, I cannot remember.

14        Presumably, the one good indication of the value here

:48:04    15   is that TQ Delta paid some amount of money to Aware for this

16   patent portfolio, right?

17        MR. SCOTT MCBRIDE:  The parties disagree as to how

18   probative that is, but, yes, your Honor, that's correct.

19        THE COURT:  Right.  So, the parties know how much

:48:16    20   that's -- what that number is, right?

21        MR. SCOTT MCBRIDE:  They do.

22        THE COURT:  Okay.

23        You know, I'm sensitive, I think, to the fact that

24   there is some information, which arguably could be relevant to

:48:38    25   valuation, which at the same time is information that, in my

1   opinion, the defendants shouldn't have, because it sort of gives

2   them an unfavorable litigation advantage.

3          And, so, I saw in the Proposed Order, stuff about

4   including -- this is Proposal No. 5 -- quote, Including

:49:12   5   plaintiff's funding entities that provided funding as part of

6   what I'm being asked to provide.

7          And I don't think the entities that are providing the

8   funding, or the amount of the funding are relevant, or likely to

9   lead to relevant information.

:49:36   10   And what's more, I think they are -- I think really

11   they should be off limits unless they are really necessary, and

12   I don't think they are necessary.

13         In terms of these other things you are asking for, it

14   does strike me that if plaintiffs are busy saying to investors,

:49:56   15   these patents are worth X, Y, or Z, or something else, that

16   plaintiff's evaluation of the patents is certainly something

17   that an expert would want to consider, right?

18         MR. SCOTT MCBRIDE:  It depends, your Honor.

19         If you are talking about valuation in terms of --

:50:22   20   valuation in terms of, you know, this is how the litigation is

21   going, and these are the funds in the bank.

22         THE COURT:  Right.  But there's -- but there's -- you

23   know, so let's assume that there is somebody at TQ Delta who

24   says, well, let's do this, because probably all of us have done

:50:38   25   this at one point or another -- you go to get a mortgage on your

1    house.

2         The bank asks you, well, what is the house worth, and

3    you put down a number.

4         That doesn't mean the house is exactly worth that

:50:50    5    number, but it's a pretty good indication.

6         And, so, it strikes me that it would be the case that

7    when you're trying to raise funds, you make representations

8    about the value of the patents.

9         And, so, I don't think the actual amount of funds you

:51:06    10    raise is relevant, but I think what you say about it to try to

11    raise them is relevant.

12         So, I'm inclined to say that there could be

13    communications, and other sorts of documents that do have an

14    impact on value, and I don't think it's unfair to make you

:51:40    15    produce them.

16         And I guess what I'm wondering about is, do you know,

17    are there such documents?

18         MR. SCOTT MCBRIDE:  I don't know if there were such

19    documents, in terms of what we're talking about communications

:51:56    20    to investors.  I don't know if there are such documents.

21         THE COURT:  Right.  All right.

22         So, I'd be inclined on the No. 5, on the proposal, to

23    order you to produce investor reports, strategic plans,

24    communications with investors or other persons related to the

:52:20    25    value of plaintiff -- well, actually, I don't care so much about

1    the value of plaintiff -- but to the value of your patents.

2          Do you have an objection to me ordering you to do that?

3          MR. CHIPLUNKAR:  When they say, investor reports, are

4    we looking for -- that's a nebulous term.

:52:44    5          Are we looking for K1s, are we looking for --

6          THE COURT:  Well, presumably -- well, what are you

7    looking for?

8          MR. STEPHEN MCBRIDE:  Your Honor, we don't have any

9    financial information on the value of the patents or -- or the

:52:56    10    entity itself, which is composed of the patent, so that's what

11    we're looking for.

12          The relevant universe of the documents that would

13    provide this kind of valuation information.  It doesn't have to

14    be an investor report, but there is deposition testimony about P

:53:10    15    and L statements, and things like that, that are going out to --

16          THE COURT:  Well, so, you know, I'm not so sure P and L

17    statements are actually it.  I think we've talked before that

18    Aware licensed these patents once upon a time.  You know, that's

19    -- I assume you have that information already -- but I think --

:53:32    20    and profit and loss statements, they're not representations of

21    value.  They're just talking about income.

22          And I think we've also established that, at least since

23    TQ Delta had these patents, it hasn't licensed these to anyone,

24    so presumably it has no income, more or less, right?

:53:52    25          MR. SCOTT MCBRIDE:  That's been discussed in the past,

1    your Honor.

2            THE COURT:  Okay.  That's a good answer.

3            So, I find it hard to believe, though you never know,

4    that TQ Delta has -- I would expect TQ Delta has been making

:54:18    5    representations in some form or fashion.  I don't know what they

6    are, as to the value of the patents.

7            So, I'm going to order you to look for such things and

8    to produce them.  I'm not going to -- you know, I agree investor

9    reports is kind of a nebulous term, and that's the reason why

:54:42    10   I'm trying to tell you what I think it is that you should be

11   looking for.

12           Where you would find these things, I don't know.  I

13   don't think it's a profit and loss statement.  I don't think

14   it's how much people are actually loading or investing in TQ

:54:58    15   Delta in order to fund the company.  You know, I don't think

16   it's your bank account balance, but I do think that you probably

17   have made representations about the value of the patents.

18           And, so, I think you should produce such information --

19   you should find it and produce it.  And if you find it on -- if

:55:28    20   you -- and, so, I'm going to direct that you actually do that.

21           If it turns out that you have nothing, then you can say

22   you have nothing, but I would think you probably have something,

23   okay?

24           MR. SCOTT MCBRIDE:  Understood, your Honor.

:55:42    25           THE COURT:  All right.

1       MR. SCOTT MCBRIDE:  And that's to produce our log?

2       I mean, to the extent -- to the extent we find

3   something that falls in that category that plaintiff contends is

4   privileged, we would have to --

:55:54      5       THE COURT:  Well, the privilege is the next topic.

6       MR. SCOTT MCBRIDE:  Okay.

7       THE COURT:  What I'm saying is -- and I don't know

8   whether it's privileged or not.  But I'm not directing you to --

9   I don't think you should have to produce something that explains

:56:10     10   your financing, okay?

11       MR. SCOTT MCBRIDE:  Okay.

12       THE COURT:  All right.

13       So, then that leaves the last thing, which is the

14   privilege logs.

:56:22     15       And, honestly, I'm pretty sure that this is not

16   something that I can resolved now either.  And, as I understand

17   it, because I did recently have the status report surface on my

18   desk, and I saw that there was talk about seven privileged

19   items, or allegedly privileged items, and now I see 205 to 268,

:56:50     20   which I take to be 63 items, more or less, and 306 to 380, which

21   I take to be 74 items, more or less.

22       Can somebody -- and then there's another thing -- and

23   that's just from the patent acquisitions log -- and then there's

24   another thing about the general log.

:57:06     25       If you -- and, so, what I'd like to do is, rather than

1    talk about the merits of this, just tell me how you think I

2    should go about trying to resolved this, because I -- my belief

3    is right now I have very little information.  And when you're

4    talking about privilege, unlike some of these other things where

:57:38    5    I try to give it my best discretionary cut as to what's the

6    right thing to do, the privilege is a lot more legal question

7    than a specific factual question, and is just not very well

8    resolved in these kinds of conferences.

9         How would you like me to try to go about trying to

:57:58    10    resolve this?

11         MR. SCOTT MCBRIDE:  Aside from one of these great

12    get-togethers, I mean, I'm not sure if your Honor contemplating

13    more paper on this?

14         THE COURT:  Well, that's one possibility.

:58:10    15         MR. SCOTT MCBRIDE:  And then, in which case, the

16    parties would probably develop a factual record with respect to

17    the documents -- the claim charts and the documents in question.

18         THE COURT:  I take it, notwithstanding my assistance

19    here with some amount of the exhibits and things, my impression

:58:30    20    is, when I've done this sort of exercise before, usually people

21    are submitting Declarations, and the facts are important.

22         MR. SCOTT MCBRIDE:  Yes, your Honor.

23         THE COURT:  Do the defendants have anything to say

24    about this?

:58:48    25         MR. CHACHKES:  If there's going to be additional

1    briefing, your Honor, we probably would ask that it be

2    accelerated to some degree, because discovery is fast closing,

3    and TQ Delta has asserted privilege over everything they do;

4    accounting, finance, talking to investors.

:59:04    5    THE COURT:  This is beyond the scope of what's in this

6    letter here?

7    MR. CHACHKES:  No, we've already -- we've already

8    joined that issue, and that was the subject matter of the thing

9    that was in the status conference.

:59:16    10    THE COURT:  The status report?

11    MR. CHACHKES:  The status report, I'm sorry.

12    So, it might make sense to have, we could file our sort

13    of omnibus privilege motion, and get the response with the facts

14    and declaration to finish it once and for all.

:59:34    15    THE COURT:  All right.

16    Well, I think it would good to essentially, quote,

17    "finish it once and for all."

18    MR. MANLEY:  I think that's accurate.  I think one sort

19    of additional point on that is that the general log point was,

:59:44    20    there's the patent acquisition log, which is one issue, and then

21    the general log issue which is more, we haven't seen TQ Delta's

22    internal documents be produced or logs.

23    And we were essentially in the general log section

24    asking that they be produced, or they be logged, because there

:00:04    25    has to be internal documents of some kind.

1          And that may be something we can resolve today.

2          THE COURT:  We're not resolving any privilege things

3    today.

4          MR. MANLEY:  And not -- not in terms of anything could

:00:20    5    be waived, but whether that -- that TQ Delta should have to

6    product or log relevant internal documents.

7          THE COURT:  All right.

8          Well, so, you are the ones that are bringing this.

9          When would you like to file your, so to speak, omnibus

:00:34    10   paper that addresses whatever issues about privilege logs you

11   want to address?

12         MR. MANLEY:  Let me look at the calendar here real

13   quick, if that's okay?

14         THE COURT:  Yes.

:00:48    15        (Pause)

16         MR. CHACHKES:  Yes, maybe the end of next week, your

17   Honor.  We have the Markman Hearing next Tuesday, so that will

18   be a monkey wrench, so maybe at the end of next week?

19         THE COURT:  And just -- today is the 11th, the 22nd?

:01:14    20        MR. MANLEY:  21st.

21         THE COURT:  Oh, yes, today is Tuesday.

22         All right.

23         Do you think I can ask for your response two weeks from

24   then?

:01:26    25        MR. SCOTT MCBRIDE:  Yes, your Honor.

1          THE COURT:  Okay.  All right.

2          Ten business days, or two weeks, so whatever the Friday

3   is in early November.

4          And because of the way these things go, I will need a

:01:46      5   reply from you all.

6          Can I get your reply the following Friday?

7          MR. CHACHKES:  Yes, your Honor.

8          THE COURT:  So that's what we'll do about that?

9          Yes, Ms. Ying?

:01:56     10          MS. YING:  I think that Friday is Veteran's Day.

11          THE COURT:  It is.

12          So, does that mean you all are taking the day off,

13   because I am, but that does not mean -- that does not mean that

14   the electronic filing system will not be open.

:02:16     15          So, if you are taking the day off, that's fine, but if

16   you are going to be working that day anyhow, as I sometimes

17   think these private attorneys are, then it's as good as the next

18   day, but don't let me brow beat you one way or the other.

19          MS. YING:  I'm going to defer to other counsel.  I was

:02:34     20   just making the point.

21          MR. CHACHKES:  That's fine.

22          THE COURT:  Well, if you ever run for president, this

23   will be held against you.

24          But thank you, Ms. Ying, for bringing that up.

:02:46     25          THE COURT:  All right.

1    So, then, the other thing that I deferred --

2    MR. CHIPLUNKAR:  Excuse me, your Honor, one question.

3    The page limit, is it going --

4    THE COURT:  Well, so, what page limit would you like?

:03:04    5    (Pause)

6    MR. CHACHKES:  I think we can do ten, your Honor.

7    THE COURT:  You can have twenty.  I mean, you don't

8    have to use it.  If you don't need it, you don't need it, but,

9    you know, the details matter here.

:03:16    10    How much do -- well, if I give them twenty, I'll give

11    you twenty.  You don't have to use it all either.

12    MR. SCOTT MCBRIDE:  Yes, your Honor.

13    THE COURT:  And the reply can be ten, okay?

14    All right.

:03:24    15    What was the other thing that I put off here?

16    Oh, it was the standards things.

17    No, what was it?

18    MR. SCOTT MCBRIDE:  From plaintiffs, I think it was

19    Interrogatory No. 4.

:03:38    20    THE COURT:  All right.  All right.

21    Is it the case that the plaintiffs have, whether it's

22    interrogatories, or contentions, or some other way, explain how

23    the patent claims match up with the standards?

24    MR. SCOTT MCBRIDE:  Yes.

:04:30    25    THE COURT:  Okay.

1        MR. CHIPLUNKAR:  Yes, your Honor.

2        MR. MANLEY:  And, your Honor, we've asked a contention

3    interrogatory on that, and they said, here are your infringement

4    contentions.

5        And, as we saw earlier, the infringement contentions

6    literally copies some language from the standards and assert it

7    without more.

8        THE COURT:  Well, so, that's a way of saying, they have

9    don't it.  Maybe they haven't done it in enough detail, but they

10   have done it.

11       So, and they do, you know, 4.2.1.1, that's a response

12   that is referring to the standard.

13       So, you need to -- I think you need to do two things.

14       One of which is -- and this is probably easy -- but you

15   need to make clear in the information you've already provided,

16   what part of that is saying, the patent and the standards are

17   not the same, because I think that's going to help eventually to

18   narrow down what is actually in dispute here.

19       And I guess, in fact -- I mean, that is what I think

20   you need to do is, they've cited standards that they say are

21   covered by the patents.

22       And, so, you need to join them in the same level of

23   detail on the issues -- on what they've said.

24       The issues about products, that's for another day, when

25   they've provided information about the products -- and you will

1    have to provide information about your view on the products --

2    but right now we're just talking about the standards.   And

3    because I think it is the case that down the road they can have

4    an infringement theory, which is the claims read on the

:06:44    5    standard, you know, a particular standard, your product

6    practices the particular standard.

7              They can connect the dots that way, right?

8              MR. STEPHEN MCBRIDE:   Potentially.

9              THE COURT:   Yeah, as a theoretical matter.

:07:00    10             So, I think getting that issue joined is helpful to the

11    eventual resolution of this.

12             And, so, with that in mind -- and I don't mean to put

13    you on the spot here -- do you understand what I'm saying?

14             MR. MANLEY:   I think so.   That's what, I think, we have

:07:24    15    tried to do, but I understand your point we could make it more

16    clear by setting forth the information in Interrogatory No. 4,

17    and saying it in a way that's clear that we're talking about the

18    standards and whatnot.

19             THE COURT:   Okay.

:07:36    20             Well, so, why don't you do that.   I doubt that this

21    will actually -- but I think that's the first thing.

22             They're saying, for example, you know, one of the

23    claims meets the standard 4.2.1.1 -- and maybe they quote some

24    language, I'm not sure what, I don't have it right in front of

:07:58    25    me -- but you need to do something that says whether or not you

1    think the claim does meet 4.2.1.1 in whatever sort of responsive

2    level of detail to what they've already said, and hopefully that

3    will advance us in the right direction.

4           MR. MANLEY:  Sure.

:08:16    5           THE COURT:  Do you think you can do that by November

6    1st?

7           MR. MANLEY:  I think so.

8           MR. CHACHKES:  I think so.

9           THE COURT:  All right.  Okay.

:08:22    10          So does that -- not may1be in the best fashion -- but

11   that addresses everything that has been raised, and we'll have

12   the privilege things briefed, okay?

13          MR. SCOTT MCBRIDE:  Yes, your Honor.

14          If I could speak to the last point just one time?

:08:36    15          THE COURT:  Yes.

16          MR. SCOTT MCBRIDE:  There was something Mr. Chachkes

17   said earlier that might be helpful to be instructive with

18   respect to our response, and that was Mr. Chachkes said that,

19   you know, some portion of the specification was optional.

:08:48    20          Well, if that's the defendants' contention, then I

21   think that's -- that's something that can be stated that would

22   be helpful.

23          The position that the defendants are taking would be

24   helpful to --

:08:56    25          THE COURT:  Well, for example, if you say meets

1    4.2.1.1., have you said that that's a mandatory portion?

2              MR. SCOTT MCBRIDE:  Not necessarily, your Honor.

3              What we've said is that that is -- that's practiced, so

4    this claim reads on that portion of the standard.

:09:18    5              They might contend, well, our product doesn't comply

6    with that portion of the standard, or our product doesn't need

7    to comply with that portion of the standard, it's optional.

8              THE COURT:  Well, and, so, it's a second there --

9              MR. CHACHKES:  So, this frames an excellent issue,

:09:32   10    which is, they haven't stated in their infringement contentions

11    that Section 1.1.  whatever is mandatory, nor have they tied

12    that section to any accused product.

13              THE COURT:  Right, right we're not talking about

14    accused -- the second part there -- but...

:09:50   15              All right.

16              So, you said that frames an excellent issue.

17              Keep going.

18              MR. CHACHKES:  So -- so, if we're to respond to that

19    issue, it would be great to hear some evidence, their evidence

:10:00   20    that this section is actually mandatory.  Not simply it exists

21    in the standard, or if somebody -- we need to know more.

22              THE COURT:  Well, you know, they're saying -- I

23    understand what you're saying, and that's not an unreasonable

24    thing to say, but in a way, I'm kind of wondering if they're

:10:24   25    saying the claim meets the standard.

1          It seems to me that it's implicit that they're saying

2     the standard is required, because it's optional, they are not

3     really saying much of anything at all.

4          And, so, if you have a view that the claim doesn't,

:10:42     5     because it's optional --

6          MR. CHACHKES:  I think it's because the way burdens

7     work, because if they haven't satisfied their burden of showing

8     it's mandatory with evidence --

9          THE COURT:  Well, but the evidence would be, isn't the

:10:54    10     standard -- isn't it -- you know, I understand these thick

11     documents -- don't standards themselves say what's optional and

12     what's mandatory?

13          MR. CHACHKES:  We have found that that's not the case,

14     your Honor.

:11:08    15          So, for example, we'll just take "low power mode."

16          That's in some 2.0 products I understand out there in

17     the world.  The DTV products don't practice the low power mode.

18          So, whatever the standard says, whether one could or

19     could not make the argument that it's mandatory -- and I would

:11:30    20     love to hear the evidence that it was -- I don't think we'd do

21     it.

22          So, this should be a two-way street, that we should get

23     an update from plaintiffs on their infringement contentions as

24     to why they think -- not merely by virtue of existing in a

:11:46    25     standard -- but why they think our products have it, and then we

1    can response proportionally.

2           THE COURT:  Right.  Well, the products, you know, that

3    would be a good thing to have that, but we don't seem to be

4    there yet.

:11:58   5           (Pause)

6           Well, hold your thought for a minute.

7           What is your response in terms of the mandatory

8    optional thing Mr. Chachkes says is not unreasonable?

9           You just say, here this, here's that.  You don't

:12:22   10   explain why -- you don't say that the standard part is

11   mandatory.  You just say it's there?

12          MR. SCOTT MCBRIDE:  Yes, your Honor.

13          And the point is for them to say that -- excuse me --

14   for the defendants to say the product doesn't comply with that

:12:44   15   portion of the standard.  I mean, for two different reasons for

16   Mr. Chachkes.

17          One is, even though the structure is there, it's not

18   actually enabled to practice, and I think that was just stated

19   with respect to 2.0.

:12:56   20          THE COURT:  Well, okay, so --

21          MR. SCOTT MCBRIDE:  We can characterize it differently,

22   but if you publish something that says it's a 2.0 product,

23   that's what plaintiffs going to contend is that you've

24   identified this is a 2.0 product.

:13:08   25          You contend that functionality is not practiced.

1    That's one reason.  A different reason would be we practice the

2    standard, but the portion you've identified is optional, and

3    that portion is not practiced by us.

4         Those are two different reasons for them to say why it

:13:24    5    is that they contend that the claims, or the standard doesn't

6    read on their product.  It doesn't matter what plaintiff has

7    alleged with respect to it.  Plaintiff has alleged this is the

8    claim, it covers a standard, this is why it covers the standard.

9         Why is it that you contend you don't comply with the

:13:40   10    standard that the products have been declared to be complying

11    with?

12         MR. CHACHKES:  And, so, what I heard was first, you

13    published something that says you comply with 2.0.

14         I don't believe we do, but you haven't identified it.

:13:54   15         So, if they would like us to -- so, the burden is not

16    on us to say that we don't do something.  The burden is on them

17    to say, you do it, and then we respond.

18         So, if the position is, you publish something that says

19    you're MoCA-compliant, and that's all the plaintiffs are going

:14:10   20    to rely on, I would like to see that document, because I know

21    DTV doesn't advertise MoCA-compliant.  So I would be interested

22    in hearing what that is, and then we can respond.

23         Until then all we can respond is, to the best of our

24    knowledge, this is not mandatory, because this is all done by

:14:28   25    third parties, incidentally.

1         And, so, it would be kind of a generic response.

2         We'd like to hear what their evidence is, then we can

3    respond.

4         MR. SCOTT MCBRIDE:  May I respond, your Honor?

:14:44    5         THE COURT:  All right.

6         MR. SCOTT MCBRIDE:  The parties have earlier in this

7    case, I think all the parties have identified to the plaintiffs

8    they've identified defendants, these are their products.  They

9    -- tell us which products comply with 1.0, tells us which

:14:58    10   products are 2.0, et cetera, and I think we got responses from

11   all the defendants.

12        So, discovery has been taken in this case that provides

13   that level of information.

14        THE COURT:  All right.

:15:06    15        That's not really, I think, notwithstanding you both

16   talked about, that's not what we're -- actually, that is not

17   actually what I was talking about right now.

18        How would one -- if the -- is the problem that the

19   standards that sort developed over time, there is some body out

:15:40    20   there, and they don't put in the standards themselves

21   necessarily, which ones are mandatory, and which ones are

22   optional, you have to figure that out from some other things

23   that they do?

24        MR. CHACHKES:  I think one of the problems here, your

:15:54    25   Honor is, there are standards and there are standards.

1        So, wireless, for example, I need my Intel router to

2    talk to a linksys something or other, and everybody has to do

3    the same thing.

4        This is a standard where one company does something

:16:12    5    internally in the home where only their own devices are talking

6    with their own devices.

7        So, everything in that sense is optional, because the

8    entertainment company, the provider of digital services, doesn't

9    need to do anything.  They don't have to talk to somebody else's

:16:32   10    devices.

11        So, the more we dig -- and we don't make our own boxes,

12    which is one of the big problems here -- so, it's very difficult

13    for us to say categorically this happens, and this happens in

14    the devices.

:16:42   15        But the more we dig the more we find, well, you know,

16    there's a chip, and there are some aspects of MoCA that were

17    complied with on the chip -- and that's all our interrogatory

18    said.  We didn't say the pieces that are involved in this case

19    are complied with on this chip.

:17:00   20        We don't know.  They don't know.  And the more we dig,

21    the more we find there's a great deal of flexibility in the

22    standard, so that's a different kind of standard case.

23        THE COURT:  All right.

24        Hold on a minute.

:17:16   25        So, in your contentions, everyplace where you've cited

1    a standard, are you contending all those standards are

2    mandatory?

3           MR. CHIPLUNKAR:  Yes, without phase scrambling those

4    boxes, it would not work.  And -- and Mr. Chachkes just

:17:30    5    mentioned that, you know, the boxes are developed specifically

6    for one vendor, if you will, but that's not the case, that's why

7    they do MoCA.

8           THE COURT:  All right.

9           So, it seems to me from the little that I've seen in

:17:48   10    the contentions that, as I said earlier, I think implicitly

11    they're saying they're mandatory.  You know, they don't cite

12    anything.

13           And you seem to have a general view as to which ones

14    are and which ones aren't.  You don't need to cite anything as

:18:14   15    to why your views are what they are, but I think that you --

16    where you think something is not mandatory, you ought to say

17    that.

18           And, you know, the parties trying to hone in on why Mr.

19    Chiplunkar says, won't work without it -- and I don't know if

:18:36   20    that is the same thing as saying it's mandatory or not -- that's

21    for another day.

22           But at the very superficial level that they've said

23    they're mandatory, so superficial, I have to read into what they

24    said.

:18:46   25           I think you should say what you think is not mandatory,

1    and the details are something, you know, would benefit from

2    further refinement down the road, but we're not at that point

3    yet, all right?

4            MR. CHACHKES:  Thank you, your Honor, yes.

:19:06    5            THE COURT:  Okay.

6            So thank you.  The transcript will serve as the Order

7    of the Court here, and I look forward to more reading from you,

8    and you say that I have some hearing with you shortly?

9            MR. CHIPLUNKAR:  A Markman.

:19:22   10            THE COURT:  When is that?

11            MR. CHIPLUNKAR:  A week from today.

12            THE COURT:  All right.

13            Well, I will read your stuff.

14            MR. SCOTT MCBRIDE:  Thank you, your Honor.

:19:28   15            MR. CHACHKES:  Thank you, your Honor.

16            MR. STEPHEN MCBRIDE:  Thank you, your Honor.

17            (The proceedings adjourned at 10:19 o'clock a.m.)

18                            *  *  *  *  *

19

20

21

22

23

24

25